UNITED STATES of America,
Appellant,

v.

Andrew JENKINS, Defendant–Appellee.

No. 525, Docket 88–1308.

United States Court of Appeals,
Second Circuit.

Argued Jan. 26, 1989.

Decided June 5, 1989.

Vincent L. Briccetti, New York City, Asst. U.S. Atty., S.D.N.Y. (Rudolph W. Giuliani, U.S. Atty., Linda Imes, Asst. U.S. Atty., of counsel), for appellant.

Samuel A. Abady, New York City (Abady & Jaffe, of counsel), for defendant-appellee.

Before PRATT and ALTIMARI, Circuit Judges, and LEONARD B. SAND, District Judge, Southern District of New York, sitting by designation.

PER CURIAM:

The United States appeals an order of the United States District Court for the Southern District of New York, Miriam Goldman Cedarbaum, *Judge,* granting defendant's motion to suppress evidence obtained from a warrantless search of his suitcase. We reverse in part and remand.

## BACKGROUND

FBI agents, involved in an undercover investigation of money laundering, conducted a series of meetings with New York State Senator Andrew Jenkins. At these meetings, some of which were taped, Jenkins indicated his willingness to carry large amounts of cash out of the country without

filing the currency reports required by 31 U.S.C. § 5316(a). Jenkins advised the agents that he would be leaving the country on August 1, 1987, and the FBI confirmed that Jenkins had a reservation on a flight to Zaire on that day. On August 1, an agent met Jenkins at a restaurant located in mid-town Manhattan. The agent brought $150,000 in "sting money" which he gave to Jenkins after obtaining assurances that Jenkins planned to take the money out of the country that evening. Jenkins examined the money and, in full view of the agent, placed it in his suitcase.

As Jenkins began to leave the restaurant, FBI agents, acting without a warrant, took Jenkins into custody, handcuffed him, and seized the suitcase. An agent then opened the suitcase and retrieved the "sting money". During this process, the agent found an airline ticket to Zaire, a document showing that Jenkins had obtained the shots necessary for travel to Zaire, and additional documents written in a foreign language allegedly indicating that Jenkins had engaged in the business of receiving bank deposits without proper authorization under state and federal law.

On September 29, 1987, a grand jury handed down a two-count indictment against Jenkins. Count I alleged that Jenkins "was about to transport monetary instruments of more than $10,000" from New York to Zaire without filing the customs form required by 31 U.S.C. § 5316(a). Count II charged that Jenkins violated 12 U.S.C. § 378 when he engaged in the business of receiving bank deposits without proper authorization.

Claiming that he had no duty to file the customs form before arriving at the airport, Jenkins moved the district court to dismiss count I of the indictment. In addition, arguing that the agents had no probable cause to arrest him, and in any event, that those agents could not conduct a warrantless search of his suitcase once he was in custody, Jenkins also moved the court to suppress all evidence obtained from the search of his suitcase.

In response, the government contended (1) that Jenkins' assurances that he would take the money out of the country without filing the proper forms, coupled with his other actions—including buying a ticket to Zaire and obtaining the necessary immunizations—were sufficient to make out a violation of § 5316(a); (2) that the arrest was lawful because, based on their knowledge of Jenkins' actions, the government agents had probable cause to arrest him immediately after they gave him the "sting money"; (3) that the search of the suitcase was proper as a search incident to lawful arrest; and (4) that, even if the district court were to reject the arguments above, the agents still had the right to open the suitcase in order to recover the "sting money" and that thereafter, the plain view and inevitable discovery exceptions to the warrant requirement allowed them to seize the documents contained in the suitcase.

After lengthy oral argument, the district court rejected all of the government's contentions. First, it held that under § 5316(a), an individual has no duty to file the customs form before the time of his departure. Hence, because Jenkins was arrested some nine hours before he was to have departed from New York, the court held as a matter of law that the crime charged had not been committed, and dismissed count I of the indictment. *United States v. Jenkins*, 689 F.Supp. 342, 344 (S.D.N.Y.1988). Second, the court found that even if a crime had been committed and the arrest had been justified, the search of the suitcase after Jenkins was already in custody—when there was "no suggestion of exigency"—violated defendant's fourth amendment rights. Finally, although agreeing that recovery of the "sting money" was permissible, the district court found it unnecessary to consider whether the plain view or inevitable discovery exceptions allowed the government to seize the other evidence contained in the suitcase.

The government appeals.

## DISCUSSION

On appeal, the government does not appeal the district court's dismissal of count I. Nor does it challenge Judge Cedarb-

aum's determination that there were no exigent circumstances, and thus that the government agents could not constitutionally seize the documents in the suitcase based on a search incident to lawful arrest. As a result, we are left with only two issues: (1) did the agents act properly when they seized and entered defendant's suitcase in an attempt to retrieve government property, and (2) if so, did either the plain view exception or the inevitable discovery exception to the fourth amendment's warrant requirement allow them to seize other evidence in the suitcase?

### A. Could the Agents Recover the "Sting Money" from Jenkins' Suitcase?

Our determination as to the first of these issues is no easy task. Sting operations are inherently a dirty business, *see generally United States v. Archer,* 486 F.2d 670, 674–75 (2d Cir.1973), with the potential—unless the agents conducting the sting are well-trained and highly organized—for significant confusion and substantial abuse. Nevertheless, courts have long recognized that such operations are permissible, often necessary for effective law enforcement. *See United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973) (the "only practicable means of detection" of some types of criminal activity is "the infiltration of [that activity] and a limited participation in [its] unlawful present practices").

Such is especially true in cases of political corruption. Acknowledging the overriding interest of society to have honest men and women in government, we have long "permitted Government agents, in the public interest, to employ artifice to apprehend public servants who abuse the trust invested in them by virtue of their position", *United States v. Alexandro,* 675 F.2d 34, 34 (2d Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982), so long as such operations do not violate "fundamental fairness" or utilize means "shocking to the universal sense of justice". *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643; *see Kinsella v. United States,* 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960).

One of the inherent risks associated with sting operations, however, is that—either through faulty training, faulty planning, or just plain bad luck—the "sting" may backfire. Having for all appearances entered the marketplace, agents may discover, after giving funds or other public assets to a suspect, that what they first saw as a criminal violation is, in fact, no crime at all. Or it may be that after assuring the agents that he will use the money to commit a crime, a suspect may decide not to commit the contemplated crime but convert the money to his own use. The question arises whether, without playing out the scenario, the government may immediately recover its "sting money" from the suspect without having to resort to civil remedies. In other words, upon realizing that the "game" may not go as planned, can law enforcement officials call "time out", recover their assets, and then perhaps resume playing the "game" with someone else?

■ At best, this issue is a thorny one, with implications going to the very heart of the fourth amendment. However, we are convinced that, at least in the narrow situation before us—where Jenkins told the agents before receiving the "sting money" that he intended to commit a crime, where the agents gave Jenkins the money as a direct result of these assurances, where the agents had Jenkins under surveillance through the entire meeting, where they saw him put the money in the suitcase, where Jenkins had not yet left the meeting location, and where there was no gap in surveillance—the FBI agents acted properly in opening the suitcase to recover the $150,000 even if they had no probable cause to arrest Jenkins. At least on these facts, Jenkins had no legitimate expectation of privacy in the area where he had placed the money, *cf. Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983) ("If the inspection by the police does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Warrant Clause."); *United States v. Singh,* 811 F.2d 758, 761 (2d Cir.) (in controlled delivery case, defendant has no expectation of privacy because government is "deemed to be in construc-

tive possession" of contraband even after it is delivered to defendant), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3264, 97 L.Ed.2d 763 (1987), and the agents had a significant responsibility to safeguard taxpayer funds, especially if they had any reason to suspect that those funds might disappear with Jenkins when he left the meeting location.

### B. *Does an Exception to the Warrant Requirement Allow Seizure of the Documentary Evidence Contained in Jenkins' Suitcase?*

Having held that the government could open the suitcase to retrieve its money, we must now determine whether the government could also seize the documentary evidence in Jenkins' suitcase. Generally, of course, law enforcement officials must obtain a warrant before they may seize an individual's property. *See Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). This warrant requirement creates a presumption that any warrantless search or seizure is unconstitutional, and requires that evidence obtained in such illegal searches be excluded from trial. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

Over the past several decades, the Supreme Court has identified several exceptions to this warrant requirement. The government argues that two of these exceptions—plain view and inevitable discovery—apply to the facts before us. We shall discuss each in turn.

#### 1. *The Plain View Exception.*

■ The plain view exception "authorizes seizure of illegal or evidentiary items visible to a police officer whose access has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983); *see Washington v. Chrisman,* 455 U.S. 1, 5–6, 102 S.Ct. 812, 815–816, 70 L.Ed. 2d 778 (1982) ("The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be."). Under this exception to the warrant requirement, a law enforcement officer may seize evidence in plain view if: (1) the officer's initial intrusion was permissible under the fourth amendment; (2) the discovery of the evidence is "inadvertent"; and (3) the incriminating nature of the evidence found is "immediately apparent". *Coolidge v. New Hampshire,* 403 U.S. 443, 464–73, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1971); *United States v. Escobar,* 805 F.2d 68, 72 (2d Cir.1986).

There is no doubt, in light of our holding that the FBI agents properly opened the suitcase to retrieve the "sting money", that the first prong of this exception is satisfied. We remand to the district court, therefore, to determine whether discovery of the documents in the suitcase was "inadvertent", and whether the incriminating nature of those documents was "immediately apparent" to the agent conducting the search. These are factual matters to be addressed by the district court at the hearing on remand.

#### 2. *The Inevitable Discovery Exception.*

■ The second exception advanced by the government is inevitable discovery. Under this exception, "evidence that was illegally obtained will not be suppressed 'if the government can prove that the evidence would have been obtained inevitably' even if there had been no statutory or constitutional violation." *United States v. Roberts,* 852 F.2d 671, 675–76 (2d Cir.1988) (*quoting Nix v. Williams,* 467 U.S. 431, 447, 104 S.Ct. 2501, 2510, 81 L.Ed.2d 377 (1984)). In maintaining that this exception allowed it to seize the evidence in question, the government's only claim is that it inevitably would have discovered the documents contained in the suitcase when the agents transported it to FBI headquarters and subsequently conducted an inventory search.

It is true, assuming that the government could have taken custody of Jenkins' suitcase and transported it to FBI headquarters, that an inventory search, con-

ducted by government agents pursuant to FBI policy, may have been permissible. And this search, in turn, may have satisfied the requirements of the inevitable discovery exception, and thus allowed the police to seize the documentary evidence contained in the suitcase. *See Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed. 2d 1000 (1976).

However, it is also true that, before an inventory search is permissible, the government must have legitimate custody of the property to be inventoried, either as a result of lawful arrest, *see Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983); *United States v. Gorski*, 852 F.2d 692, 696 (2d Cir.1988), or by some other method. *See South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Smith*, 621 F.2d 483 (2d Cir.1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981). Here the government has not yet shown any legitimate custody.

First, the warrantless arrest of Jenkins was improper because the government did not have probable cause. The standards defining this principle are well-settled: "Probable cause to arrest exists 'when the [agents] have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense *has been or is being committed* (2) by the person to be arrested.'" *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir.1987) (brackets in original) (*quoting United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1983)) (emphasis added).

However, in this case, as the district court properly recognized, all the government had was the belief that Jenkins would commit a crime *in the future—i.e.*, that he would not report the money when the time came to do so. This is simply insufficient to create probable cause, *see generally United States v. Cruz*, 834 F.2d 47, 50 (2d Cir.1987) (probable cause arises when police reasonably believe that "an offense has been or is being committed"), *cert. denied*, —— U.S. ——, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988); *United States v. Fox*, 788 F.2d 905, 907 (2d Cir.1986) (same), and without it, Jenkins' arrest was illegal. It is this lack of probable cause for arrest that distinguishes this case from *United States v. Gorski*, on which the government principally relies in seeking a remand for a hearing on the inventory search and inevitable discovery issues. In short, because Jenkins' arrest for a crime he had not yet committed was illegal, no valid inventory search could have been based on that arrest. *See United States v. Gorski*, 852 F.2d 692 (2d Cir. 1988) (inventory search is proper incident of defendant's *lawful* arrest and detention); *cf. Illinois v. Lafayette*, 462 U.S. 640, 644, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983) ("inventory search is not an independent legal concept but rather an incidental administrative step following arrest and preceding incarceration").

Second, we find no other legitimate reason which would have allowed the agents to take custody of the suitcase, and the government suggests none. *Cf. United States v. O'Bryant*, 775 F.2d 1528 (11th Cir.1985) (abandoned briefcase, found and taken to headquarters by police, could justifiably be subjected to inventory search even after police identified briefcase as belonging to defendant); *United States v. Reynolds*, 726 F.2d 1536 (11th Cir.1984) (police, in executing a writ of possession and moving defendant's belongings from his abode, were justified in conducting an inventory search); *United States v. Smith*, 621 F.2d 483 (2d Cir.1980) (police in lawful custody of an automobile may properly conduct an inventory search), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981).

Of course, as we held above, the agents did have the right to open the suitcase in order to retrieve the "sting money". Once that was accomplished, however, any legitimate governmental interest in retaining the suitcase was gone, and Jenkins had every right to maintain possession of the suitcase. In short, the agents could not properly have taken the suitcase to headquarters to conduct an inventory search.

CONCLUSION

Although the district court properly denied suppression with respect to the "sting money", the order of the district court, insofar as it suppressed the documentary evidence found in Jenkins' suitcase, is reversed, and the case is remanded to the district court for further proceedings including a hearing to determine whether the documents in question may be admitted under the plain view exception.