UNITED STATES of America,

v.

Angel MENDEZ.

No. CRIM 3:00CR195 AVC.

United States District Court,
D. Connecticut.

April 26, 2001.

Thomas V. Dailey, Ronald Scott Apter, U.S. Attorney's Office, Hartford, CT, for Plaintiff.

Thomas G. Dennis, Federal Public Defender's Office, Hartford, CT, for Defendant.

### RULING ON THE DEFENDANT'S MOTION TO SUPPRESS

COVELLO, Chief Judge.

The defendant, Angel Mendez, is charged in a one count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The charge arises out of his arrest on July 31, 2000 in Hartford, Connecticut, when he was found to be in possession of a Heritage Stealth Shadow 40 caliber pistol ("the handgun").

The defendant now moves to suppress all items seized from a search of his automobile at the time of his arrest, including the handgun, and to suppress various incriminating statements he gave to police. The issues presented are: (1) whether police had probable cause to search the glove box of the defendant's vehicle; (2) whether the search of the glove box was constitutionally permissible under the search-incident-to-arrest doctrine; (3) whether the inevitable discovery doctrine saves the handgun and other incriminating evidence found in the glove box from Fourth Amendment impunity; and (4) whether the incriminating statements the defendant gave to police at the time of his arrest should be suppressed because the defendant was not advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

For the reasons hereinafter set forth, the court concludes that: (1) police did not have probable cause to search the glove box of the vehicle; (2) the search of the glove box was not constitutionally permis-

sible under the search-incident-to-arrest doctrine; (3) the inevitable discovery doctrine nevertheless saves the handgun and other incriminating evidence from Fourth Amendment impunity; and (4) because the government does not object to the defendant's motion to suppress the incriminating statements given to police prior to a *Miranda* advisement, such statements shall be suppressed.

## FINDINGS OF FACT

On July 31, 2000, at approximately 10:50 p.m., Officer Edward Foster of the Hartford police department was on duty and in uniform in a marked police cruiser in the Frog Hollow section of Hartford. At this time, Foster observed the defendant leaning into the open, passenger side window of a red Chevrolet Beretta automobile ("the Chevrolet" or "the vehicle") that was parked in the lot of a Mobile gas station/convenience store located at the intersection of Washington street and Jefferson street. An unidentified Hispanic male was sitting in the driver's seat. Foster knew the defendant because of several prior interactions with him while on patrol. In addition, Foster knew that the defendant: (1) was a member of the Los Solidos gang; (2) had prior narcotics convictions; and (3) was wanted for stealing a car in West Hartford, Connecticut.

Foster approached the Mobile station in his police cruiser, and observed the defendant leaning into an open passenger side window of the Chevrolet. Foster then observed the defendant stand-up and look directly toward him, making eye contact. The defendant then quickly ducked back into the car, putting his whole torso back through the open passenger side window, then quickly removed himself from inside the car and walked quickly into the convenience store. Foster could not see the defendant's hands, but perceived his actions as "suspicious," and believed that the defendant might be trying to get rid of something by throwing it into the car.

Foster parked his police cruiser in front of the convenience store and walked into the store. Inside the store, the defendant said, "What's up, Foster." Foster then advised the defendant that he had a warrant for his arrest, placed him under arrest and handcuffed him, and then walked him out of the store and into the rear seat of his police cruiser. At this time, Foster noticed that the Hispanic male who had been in the driver's seat of the Chevrolet had left the scene and, after inquiring about his whereabouts, an unidentified passerby told Foster that the man had fled.

Without first advising the defendant of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Foster asked the defendant if he owned the Chevrolet. The defendant responded that the Chevrolet belonged to him, and that he had just bought it. The defendant also told Foster that the car was not registered or insured. Foster then ran the license plate displayed on the Chevrolet through the Connecticut Department of Motor Vehicle ("DMV") computer system and a report came back stating that the plate had been registered to another car, and canceled prior to the subject date. Foster also checked the vehicle identification number displayed on the Chevrolet with the DMV computer system and it revealed that the car was registered to another license plate that was not on the vehicle.

Another Hartford police officer, Heriberto Resto, arrived at the Mobile station as Foster was placing the defendant in his cruiser. Foster told Resto that the defendant had made a quick movement into the Chevrolet and that he believed the defendant might have thrown something into it. Resto, who believed that the Chevrolet

would be towed, decided to conduct an inventory search of the Chevrolet. During the search, Resto found a handgun in the unlocked glove box that is the subject of the indictment, a loaded Heritage Stealth Shadow .40 caliber pistol. After Resto turned the handgun over to Foster, Foster secured the weapon, walked over to the Chevrolet and searched the glove box himself, finding one heat-sealed packet of heroin, and the car's bill of sale, stating that, indeed, the defendant owned the vehicle.

Foster advised the defendant that the Chevrolet would be towed and, without advising him of rights under *Miranda*, asked him whether there was anything he would like to get from the car before it was towed. The defendant indicated that he wanted some items from the glove compartment. The firearm and heroin had already been found in the glove compartment prior to that request.

Foster told the defendant that a firearm had been found in the glove box, and again, without giving a *Miranda* advisement, began questioning the defendant about the handgun and heroin. While initially acting surprised, the defendant ultimately admitted to Foster that the handgun was his. The defendant also provided a written statement admitting that he had purchased the handgun for $400.

Because the defendant admitted to being the owner of the car, and no one was present at the time of the arrest to take custody of the Chevrolet, Foster ordered the car towed and impounded pursuant to Hartford police department policy. *See* Hartford Police Department General Order 7-45¶ III A.3. Further, in circumstances where an unattended car is sitting at a gas pump at a very busy convenience store, Hartford police department practice would call for the car to be towed.

It is also Hartford police department practice that prior to impounding or towing a car, a "tow slip" must be completed that notes, among other things, the make, year and model of a car, condition of the car and, in a section entitled "Vehicle Condition," officers must record whether the vehicle contains various accessories, such as a radio or tape deck, and by checking a box designated "other," officers record any valuables found. Hartford police officers are trained that in order to properly fill out the tow slip they must perform an inventory search of the car, and search the interior and compartments which includes searching the glove compartment. There is, however, no written Hartford police department policy specifically setting forth a requirement that inventory searches of cars be conducted prior to towing. In this case, Foster conducted an inventory search of the Chevrolet and filled out a tow slip, but did not check the "other" box or record that police had found the handgun, the heroin, or the bill of sale.

### CONCLUSIONS OF LAW

■ The exclusionary rule prohibits the government from offering evidence at trial that is obtained in violation of the Fourth Amendment to the United States Constitution. *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits. *Dunaway v. New York*, 442 U.S. 200, 216–217, 99 S.Ct. 2248, 2258–59, 60 L.Ed.2d 824 (1979). By excluding evidence discovered in violation of the Fourth Amendment, the rule "compel[s] respect for the constitutional guarantee in the only effectively available way, by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). The court now turns to the issues presented, that is, whether evidence discovered by Officers Foster and Resto must be suppressed as tainted fruit under the exclusionary rule.

## I

### *The Handgun & Heroin*

The defendant moves to suppress the handgun and heroin on grounds that: (1) the police officers lacked probable cause to search the Chevrolet's glove box; (2) the search was not constitutionally permissible under the search-incident-to arrest doctrine; and (3) the inevitable discovery doctrine does not save the handgun from Fourth Amendment impunity. The court considers each argument in order.

### 1. *Probable Cause*

The defendant first argues that the search violated his rights as secured by the Fourth Amendment because police did not have probable cause to search the glove box, in that: (a) neither Foster nor Resto observed the defendant commit any criminal offense; (b) the defendant did not attempt to flee upon spotting the police; and (c) Foster did not see anything in the defendant's hands when the defendant was standing by the car or walking towards the convenience store.

The government responds that, to the contrary, the search was well within Fourth Amendment boundaries because it involved: (a) a movable vehicle, and (b) was supported by probable cause in that, after Foster made eye contact with the defendant (a man whom Foster knew to be a drug dealer and gang member with an outstanding warrant), Foster observed the defendant quickly and suspiciously duck back into the car, putting his whole torso through the open passenger side window, and then quickly remove himself from inside the car and walk quickly into the convenience store, making it look like he had thrown something into the car. The court agrees with the defendant that police did not have probable cause to search the Chevrolet.

█ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and further provides that "no Warrants shall issue, but upon probable cause." U.S. Const., Amendment IV. The Supreme Court has recognized an exception to the warrant requirement where "law enforcement officials conduct a warrantless search of a movable vehicle when they have *probable cause* to believe it contains contraband or evidence of a crime." *Carroll v. United States,* 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925) (emphasis added); *see also United States v. Vassiliou,* 820 F.2d 28, 30 (2d Cir.1987). The justification for the exception is twofold: (1) the inherent mobility of an automobile creates "exigent circumstances" sufficient to excuse a failure to obtain a search warrant; and (2) the pervasive regulation of automobiles has reduced the public's expectation of privacy in them. *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 2487, 135 L.Ed.2d 1031 (1996). At bottom, this exception demands that, prior to any search, officers must have probable cause to believe that the vehicle contains contraband or evidence of a crime. *Carroll v. United States,* 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925). The court assesses the officer's determination of probable cause through the lens of what would be expected of prudent men in the same shoes. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

█ "In dealing with probable cause, however, as the very name implies, we deal with probabilities." *Brinegar,* 338 U.S. at 175–76, 69 S.Ct. 1302. "These are not technical; they are factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act." *Id.* While evidence sufficient to convict is not required, it is equally true that speculation, conjecture,

suspicion, or even a "strong reason to suspect" does not rise to the level of probable cause. *Henry v. United States,* 361 U.S. 98, 101, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (1959). The court now turns to the question of whether prudent men in the shoes of these officers (Foster and Resto) would have believed that the Chevrolet contained contraband or evidence of a crime.

■ Although the facts and circumstances evince a "strong reason to suspect" that contraband might be present in the Chevrolet, they are insufficient to warrant a man of reasonable caution to believe that the vehicle contained contraband or evidence of a crime. At the time of the search, Foster knew that the defendant had engaged in drug dealing, was a member of the Los Solidos gang, and was wanted for auto theft. Foster also observed the defendant, upon spotting police, make furtive movements within the Chevrolet and flee into the convenience store. Foster did not, however, have any independent information that the vehicle contained weapons or drugs, and did not observe the defendant commit any criminal offense or display anything incriminating in his hands. *See e.g., State v. Badgett,* 200 Conn. 412, 428–32, 512 A.2d 160 (1986) (outstanding arrest warrant for weapons charges, "unusual movements" by the driver, and the dispatcher's conclusory assertion that the driver may be armed—did not amount to probable cause to search the car); *Compare Husty v. United States,* 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629 (1931) (probable cause did exist where officers had knowledge of defendant's criminal history, observed his companions attempt to flee when told to stop and, *in addition,* were informed by reliable informant that vehicle contained contraband). Accordingly, the court concludes that prudent men in the shoes of these officers would not have believed that the Chevrolet contained contraband or evidence of a crime. Indeed, Resto, who found the gun, did not even

purport to rely on probable cause. He testified that he entered the Chevrolet and opened the glove compartment because the car was going to be towed.

## 2. *Search Incident To Arrest*

■ The defendant next moves to suppress the handgun on grounds that the circumstances surrounding the search do not call for an exception to the warrant requirement under the search-incident-to-arrest doctrine. In this regard, the defendant maintains that because he was not an occupant of the vehicle at the time of the arrest and, in fact, was in the convenience store, the search of his vehicle was not valid as an incident to his arrest. The government responds that, to the contrary, because the police first confronted the defendant when he was in the vehicle, the doctrine is applicable regardless of whether the defendant had exited the vehicle and moved to the convenience store at the time of the arrest. The court agrees with the defendant that the government may not invoke the doctrine to constitutionally justify the search.

■ The Supreme Court developed the search-incident-to-arrest doctrine in *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2040–41, 23 L.Ed.2d 685 (1969), holding that an officer making a lawful custodial arrest may search the arrestee and the immediate surrounding area into which he might reach in order to obtain a weapon or destroy evidence, i.e., the arrestee's grabbing area. *Id.* at 763, 89 S.Ct. 2034. The reasonableness of the search must be examined in the context of: (1) the need to disarm the suspect in order to take him into custody; and (2) the need to preserve evidence for later use at trial. *See id.* at 763; *see also Knowles v. Iowa,* 525 U.S. 113, 116, 119 S.Ct. 484, 487, 142 L.Ed.2d 492 (1998) (*quoting United States*

*v. Robinson,* 414 U.S. 218, 234, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)).

A little more than a decade later, the Supreme Court addressed the applicability of the search-incident-to-arrest doctrine in the context of an automobile search when an occupant had been arrested and, relying on *Chimel,* held that "when a policeman has made a lawful custodial arrest of an occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile[,]" *Belton,* 453 U.S. at 460, 101 S.Ct. at 2864, including any container found in the passenger compartment and the glove box. *Id.* at 460 n. 4, 101 S.Ct. 2860. *Belton* established a bright-line rule for automobile search cases, *Michigan v. Long,* 463 U.S. 1032, 1049 n. 14, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), and is clearly limited to those settings where an officer makes a custodial arrest "of an *occupant* of an automobile." *United States v. Hudgins,* 52 F.3d 115, 119 (6th Cir.1995) (*quoting Belton,* 453 U.S. at 460, 101 S.Ct. 2860 (emphasis original)). Since the Supreme Court decided *Belton,* other courts have applied *Belton's* bright-line rule to a myriad of cases and concluded that the search of an automobile is generally reasonable even if the occupant has exited the vehicle and is under the control of an officer, so long as the occupant exited the vehicle because an officer "actually confront[ed] [him] or [ ] signal[ed] confrontation [with him]." *Hudgins,* 52 F.3d at 119. Where, however, "the [occupant] has voluntarily exited the automobile and began walking away from the automobile before the officer has initiated contact with him, the case does not fit within *Belton's* bright-line rule, and a case-by-case analysis of the reasonableness under *Chimel* becomes necessary." *Hudgins,* 52 F.3d at 119.

In the instant case, Foster, still in his police cruiser, approached the Mobile station and observed the defendant leaning into the open passenger side window of the Chevrolet. The defendant, upon spotting police and making eye contact with Foster, quickly ducked back into car, placed his whole torso through the open passenger side window, and then quickly removed himself from inside the car and then quickly walked to the convenience store. Foster thereafter exited his cruiser, followed the defendant into the convenience store, confronted him, and placed him under arrest. While the government contends that police first confronted the defendant while he was in the Chevrolet, the court is unpersuaded that the defendant was ever an occupant of the Chevrolet and finds no evidence that Foster actually confronted him, hailed him or otherwise signaled confrontation with him [1] until he was in the convenience store. Consequently, *Belton* is inapplicable.

The court must therefore examine the reasonableness of the search under *Chimel,* i.e., with that determination turning on the need of officers to disarm the defendant or preserve evidence relating to his arrest for auto theft. Because the defendant was in the convenience store at the time of his arrest, the passenger compartment of the Chevrolet was well outside the defendant's grabbing area and consequently, the search does not pass the reasonableness test under *Chimel,* and was not a valid search-incident-to-arrest. Accordingly, the government may not rely on the doctrine to save the handgun or heroin from the exclusionary rule.

### 3. *The Inevitable Discovery Doctrine*

The defendant next moves to suppress the handgun and heroin on grounds that

---

**1.** For an officer to "signal confrontation" with a suspect, he must do more than simply make eye contact with him.

the search of the Chevrolet's glove box was unlawful and cannot be constitutionally justified under inevitable discovery doctrine. In this regard, the defendant maintains that the handgun and heroin would not have been inevitably discovered through an inventory search of the Chevrolet because the Hartford police department only requires officers to conduct inventory searches of vehicles that are seized incident to a criminal investigation. *See* Hartford Police Department General Order 7–45 IIIA.10a.ii. Because the Chevrolet was not seized pursuant to such an investigation, the defendant contends that no inventory search was required. Further, the defendant asserts that, to the extent the government maintains that the inventory here was required in order to properly fill out a tow slip for the Chevrolet, the wording of the tow slip is insufficient to guide police in determining which areas of the vehicle to search, and as such, the search procedure is not sufficiently regulated to satisfy the Fourth Amendment, and the fruits of the search must therefore be suppressed.

The government responds that even if the initial seizure of the handgun and heroin from the glove box was unlawful, these items would inevitably have been discovered during a routine, standardized inventory of the Chevrolet, to be conducted because the vehicle was going to be towed. Consequently, these items, the government avers, are not subject to the exclusionary rule. The court agrees with the government.

■■■ Evidence which comes to light by unlawful means nonetheless can be used at trial if it inevitably would have been revealed in some other lawful way. *Nix v. Williams,* 467 U.S. 431, 448, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984). This exception to the exclusionary rule is known as the inevitable discovery doctrine. *United States v. Jenkins,* 876 F.2d 1085,

1088 (2d Cir.1989); *United States v. Infante–Ruiz,* 13 F.3d 498, 503 (1st Cir.1994). The doctrine is often invoked where police discover incriminating evidence during routine inventory searches. *See e.g., United States v. Zapata,* 18 F.3d 971, 979 (1st Cir.1994). In determining whether such incriminating evidence may be used at trial, the government bears the burden of showing by reference to the facts that the items seized would have been inevitably discovered. *Jenkins,* 876 F.2d at 1088. In addition, to be permissible under the Fourth Amendment, warrantless inventory searches must be conducted according to standardized objective procedures. *Id.; see also South Dakota v. Opperman,* 428 U.S. 364, 372–75, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). While these procedures need not be in writing, *see e.g., United States v. Frank,* 864 F.2d 992, 1001–02 (3d Cir. 1988); *State v. Nelson,* 17 Conn.App. 556, 573, 555 A.2d 426, 433 (1989), they must be based on "standardized criteria or [an] established routine" designed to produce an inventory and may not be employed as a "ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990).

■■■ Here, the government has met the burden of showing that the handgun and heroin would inevitably have been discovered through an inventory search of the Chevrolet, and that, at a minimum, the Hartford police department followed an established routine in conducting the search, notwithstanding the fact that the policy was not in writing. Both Foster and Resto provided uncontradicted testimony that, for a number of reasons, Hartford police department policy called for the towing and impounding of the Chevrolet, including that the defendant, who owned the vehicle, was subject to custodial arrest with no one present at the time to take

custody of the car. By written Hartford police department policy, towing under these circumstances is required. *See* Hartford Police Department General Order 7–45¶ III A.3. Further, because the car had been left by a gas pump at a very busy intersection, towing under these circumstances is entirely reasonable. *See e.g., Nelson,* 17 Conn.App. at 571–72, 555 A.2d 426.

Foster and Resto also testified that, because the Chevrolet required towing, Hartford police department policy required them to conduct an inventory search of the vehicle's interior compartments (including the glove box) as part of their duty to fill-out a tow slip. The court concludes that this testimony is sufficient to establish as a matter of fact that the Hartford police department had a policy governing inventory searches of vehicles subject to towing, even though this policy was not, at time of the inventory search here, reduced to a written policy or Hartford Police Department General Order. *See e.g., Frank,* 864 F.2d at 1002–03 (officers testimony concerning unwritten standard procedures applicable to all impounded vehicles sufficient to establish the existence of a police department policy). Upon review of the tow slip form, the court finds that in a section designated "Vehicle Condition," the form requires the officer to check boxes corresponding to various accessories, such as a radio or tape deck, and includes a box designated "other" where an officer can note any valuables found.[2] Because Foster and Resto found the handgun and heroin by following this established, standardized routine, the court concludes that the inventory search procedure is sufficiently regulated to satisfy the Fourth Amendment. Consequently, the government may rely on the inevitable discovery doctrine to save the evidence found in the glove box from the exclusionary rule. The motion to suppress the evidence found in the glove box is therefore denied.

## II

### *Post-Arrest Statements*

The defendant next moves to suppress the statements he made to Foster at the scene of his arrest. The defendant maintains that because he was in custody at the time Foster questioned him about the gun and heroin, and was not advised of his *Miranda* rights, his incriminating statements are inadmissible. The government does not object to the motion, noting that the motion is limited to only those statements the defendant gave to police at the

---

**2.** Foster and Resto testified that under Hartford police department practice, officers record any valuables found during the inventory search by checking a box marked "other" on the tow slip and then record on the slip any valuables found. In this case, Foster did not check the "other" box, or record anywhere on the slip that he found the handgun or heroin. The defendant argues that Foster's failure to comply with this aspect of the procedure precludes the government from claiming an exception to the exclusionary rule based on the inevitable discovery doctrine. Although the court agrees with the defendant that an officer's failure to comply with his own inventory procedure constitutes evidence that a search was not undertaken to inventory contents, *see*

*e.g., Badgett,* 200 Conn. 412, 431, 512 A.2d 160 (1986), the court does not agree that such evidence, by itself, is capable of depriving the government of the exception. The failure to check a box on a form could be the result of a simple oversight and, in any event, it is not clear from the record here that Foster failed to account for anything. Foster testified that the Hartford police department policy called for officers to record "valuables," not "personal property" on the tow slip. Items such as a handgun and heroin, while personal property, are not necessarily "valuables" once surrendered to law enforcement, and upon surrender are accounted for, both by officers and the relevant prosecuting authority.

scene of the arrest and prior to being given a *Miranda* warning.

There being no objection, the court grants the motion to suppress the defendant's statements given prior to the *Miranda* advisement.

## CONCLUSION

For the foregoing reasons, the defendant's motion to suppress evidence (document number 8) is DENIED and the defendant's motion to suppress statements (document number 16) is GRANTED.