**UNITED STATES of America,**
**Appellee,**

**v.**

**Angel Antonio MENDEZ,**
**Defendant–Appellant.**

**Docket No. 02–1100.**

United States Court of Appeals,
Second Circuit.

Argued: Sept. 26, 2002.

Decided: Dec. 30, 2002.

Thomas G. Dennis, Federal Public Defender's Office, Hartford, CT, for Defendant–Appellant.

Thomas V. Daily, Assistant United States Attorney for the District of Connecticut (John A. Danaher, III, United States Attorney, Jeffrey A. Meyer, Assistant United States Attorney, of counsel), Hartford, CT, for Appellee.

Before MESKILL, SACK, and KATZMANN, Circuit Judges.

SACK, Circuit Judge.

The defendant, Angel Antonio Mendez, appeals from a judgment entered on April 26, 2001, in the United States District Court for the District of Connecticut (Alfred V. Covello, *Chief Judge*), convicting him, after a guilty plea, of possession of a firearm as a previously convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). In accordance with a conditional plea agreement, Mendez reserved the right to appeal the district court's denial of his motion to suppress evidence. *See United States v. Mendez,* 139 F.Supp.2d 273, 282 (D.Conn.2001) (denying Mendez's motion to suppress evidence). Mendez alleges that the evidence was obtained in a search that violated his rights under the Fourth Amendment to the United States Constitution. We conclude that the search

was constitutionally valid. We therefore affirm the judgment of the district court.

## BACKGROUND

On July 31, 2000, Officer Edward Foster of the Hartford Police Department was on duty, in uniform, driving a marked police cruiser. Foster saw the defendant Mendez on the grounds of a gasoline station and convenience store, leaning into an open passenger-side window of a parked Chevrolet automobile. Foster also saw another man, whom he could not identify, in the driver's seat of the automobile.

Foster recognized Mendez, whom he had encountered several times before on patrol. Foster knew that Mendez had been convicted for narcotics violations, was a gang member, and was wanted for auto theft.

As Foster drove closer, Mendez stood up and looked directly at Foster. In a series of quick movements, Mendez leaned his torso into, and then removed it from, the passenger-side window of the automobile. Foster did not see Mendez's hands, but he considered Mendez's movements to be suspicious. Foster surmised that Mendez might have thrown something into the car. Mendez then walked into the convenience store.

Foster parked his cruiser, got out, and walked into the store. As Foster entered, Mendez, with his back to Foster, said, "What's up, Foster?" without turning around. Foster advised Mendez of the auto-theft warrant. Based upon the authority of the warrant, Forster then arrested Mendez, handcuffed him, and escorted him out of the convenience store and into the back seat of the cruiser.[1]

Without first advising Mendez of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Foster asked Mendez whether he owned the Chevrolet. Mendez said that he had recently bought it, but that it was neither registered nor insured. Foster ran the Chevrolet's license plate number through the Connecticut Department of Motor Vehicles computer system. The resulting report showed that the plate had been registered to another car and then canceled. Foster also ran the Chevrolet's vehicle identification number through the computer system. The resulting report disclosed that the automobile was registered to another license plate, which was not displayed on the vehicle.

As Foster placed Mendez in the cruiser, another Hartford police officer, Heriberto Resto, arrived at the gasoline station. Foster told Resto that Mendez had ducked into the Chevrolet earlier, and that he thought that Mendez might have thrown something into it. Resto opened the unlocked glove compartment and found a loaded Heritage Stealth Shadow .40 caliber pistol, which is the basis of Mendez's conviction here on appeal. Resto gave the handgun to Foster. Foster secured it, returned to the automobile, and then searched the glove compartment himself. There he discovered a heat-sealed packet of heroin and the car's bill of sale. The bill of sale indicated that Mendez was, in fact, the owner of the automobile. Because Mendez was under arrest, no one else was present to take custody of the automobile, and the automobile was parked in a highly trafficked location, Foster ordered that the automobile be towed and impounded.

---

1. By the time Foster left the convenience store with Mendez, the other man who had been in the automobile was gone. An unidentified passerby told Foster that the other man had fled when Foster entered the store.

After a privately owned tow truck arrived, Foster filled out a "tow slip," which was provided by the towing company. The tow slip, which was admitted into evidence at the suppression hearing, is entitled "POLICE IMPOUND." It includes information about the vehicle, the reason the vehicle was towed, and various indicators of the vehicle's status, such as whether it had a tape deck, a key, a battery, or tires. There is also a box on the form, marked "OTHER," and next to it there is a blank line. Foster neither checked the "OTHER" box nor wrote anything on the adjacent line.

On September 20, 2000, a federal grand jury returned a one-count indictment charging Mendez with possession of a firearm as a previously convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On October 30, 2000, Mendez filed a motion in the district court to suppress the evidence obtained during the search of the automobile.

The district court held an evidentiary hearing in which Officers Foster and Resto testified to the circumstances of the search and to the "inventory search" policies of the Hartford Police Department. The district court concluded that the police lacked "probable cause" to search the glove compartment of Mendez's automobile, *Mendez,* 139 F.Supp.2d at 278, and that the evidence was not admissible under the "search-incident-to-arrest" exception to the exclusionary rule, *id.* at 279. The court held, however, that the evidence was admissible under the "inventory search" and "inevitable discovery" exceptions to the exclusionary rule. *Id.* at 281. Accordingly, the court denied Mendez's motion to suppress the evidence. *Id.* at 282. Mendez then pled guilty pursuant to a conditional plea agreement in which he reserved the right to appeal the district court's denial of his motion to suppress. Mendez now appeals, challenging the district court's factual findings and legal conclusions regarding the inventory search and inevitable discovery issues.

## DISCUSSION

### I. Standard of Review

■■■ We may not disturb the district court's findings of fact unless they are clearly erroneous. *United States v. Eng,* 997 F.2d 987, 990 (2d Cir.1993), *cert. denied,* 510 U.S. 1045, 114 S.Ct. 693, 126 L.Ed.2d 660 (1994). Where the district court's factual findings are premised upon credibility determinations, we grant particularly strong deference to those findings. *United States v. John Doe No. 1,* 272 F.3d 116, 124 (2d Cir.2001), *cert. denied,* —— U.S. ——, 123 S.Ct. 204, 154 L.Ed.2d 82 (2002); *United States v. Champion,* 234 F.3d 106, 109 (2d Cir.2000); *Mathie v. Fries,* 121 F.3d 808, 812 (2d Cir.1997). But the district court's applications of the inevitable discovery and inventory search doctrines raise mixed questions of fact and law, which we review *de novo. Cf. Ornelas v. United States,* 517 U.S. 690, 696–99, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (holding that lower court determinations of reasonable suspicion and probable cause are mixed questions of law and fact that appellate courts should review *de novo* ); *accord United States v. Bayless,* 201 F.3d 116, 132 (2d Cir.), *cert. denied,* 529 U.S. 1061, 120 S.Ct. 1571, 146 L.Ed.2d 474 (2000).

### II. Mendez's Motion to Suppress Evidence

In the evidentiary hearing, the district court heard testimony from Officers Foster and Resto and reviewed documentary evidence submitted by both parties. In deciding to deny the suppression motion, the district court relied chiefly on what it termed the "uncontradicted testimony" of the two officers. *Mendez,* 139 F.Supp.2d at 280. The court made the following fac-

tual findings: (1) The written policy of the Hartford Police Department required Foster to have the car towed and impounded; (2) the unwritten policy and practice of the Hartford Police Department required Foster to conduct an inventory search of the car; (3) to conduct the inventory search, Foster was required to complete a "tow slip" that noted, among other things, any valuables that remained in the car; (4) to complete the tow slip, the officers were specifically trained to search the glove compartment of the automobile to be towed; (5) Foster did, in fact, conduct such an inventory search and complete such a tow slip. *Id.* at 276. The court concluded that "Foster and Resto found the handgun and heroin by following this established, standardized routine ... [and] that the inventory search procedure [of the Hartford Police Department] is sufficiently regulated to satisfy the Fourth Amendment." *Id.* at 281.

On appeal, Mendez argues that the evidence does not support the district court's factual findings, and that in any event, those factual findings do not support the court's legal conclusions. Specifically, Mendez asserts that the testimony of the two officers was ambiguous and contradictory, and that the tow slip was not properly completed because it did not list any valuables. Therefore, Mendez contends, the search was not an "inventory search" conducted "in good faith pursuant to 'standardized criteria ... or established routine.'" *United States v. Thompson,* 29 F.3d 62, 65 (2d Cir.1994) (quoting *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990)).

### III. The District Court's Factual Findings

Having carefully reviewed the record, we conclude that the district court's factual findings were not clearly erroneous. While there are some ambiguities in the testimony of the two officers, they are largely confined to secondary matters, and the district court therefore had ample discretion to disregard them. On appellate review, testimonial ambiguities are rarely sufficient reason to overturn a district court's credibility determinations. *See John Doe No. 1,* 272 F.3d at 124; *Champion,* 234 F.3d at 109; *but see United States v. Duguay,* 93 F.3d 346, 351–52 (7th Cir.1996) (holding that inconsistent testimony of police officers failed to establish the existence of a standardized impoundment procedure under *Wells,* 495 U.S. at 4, 110 S.Ct. 1632). We also defer to the district court's factual findings that the Hartford Police Department regularly used tow slips to conduct inventories, and that Foster actually completed the tow slip in this case. After careful consideration, the district court concluded that the absence of any valuables listed on the tow slip, in the "OTHER" line or elsewhere, was not significant because, *inter alia,* there were apparently no items in the automobile that would be considered "valuables" under the Hartford Police Department's inventory policy. *Mendez,* 139 F.Supp.2d at 281 & n. 2.[2] We find no basis on which to disagree.

### IV. The Fourth Amendment Standards

The legal question presented on appeal is whether the evidence seized by Foster and Resto was properly admissible as evi-

---

**2.** The district court also speculated that Foster might have failed to check the box marked "OTHER" on the tow slip as "the result of a simple oversight." *Mendez,* 139 F.Supp.2d at 281 n. 2. This speculation was not supported by the record. The two officers both testified that checking the box marked "Other" was an important aspect of the Hartford Police Department's inventory policy.

dence against Mendez under the inventory search exception to the Fourth Amendment's warrant requirement, under the inevitable discovery exception to the Fourth Amendment's exclusionary rule, or under some combination of the two.

## A. Inventory Searches

 When the police impound vehicles or detain suspects, they frequently perform inventory searches. *See, e.g., Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (holding admissible evidence recovered during an inventory search of a shoulder bag possessed by a lawfully arrested person); *South Dakota v. Opperman*, 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (holding admissible evidence discovered during the impoundment of an illegally parked automobile).[3] Such searches are constitutional under the Fourth Amendment because they "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). Today, "the inventory search constitutes a well-defined exception to the warrant requirement." *Lafayette*, 462 U.S. at 643, 103 S.Ct. 2605.

 Of course, "the right to [make an] inventory ... does not carry in its wake unlimited discretion." *United States v. Griffiths*, 47 F.3d 74, 78 (2d Cir.1995). Under the inventory search doctrine, we have held that "law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to 'standardized criteria ... or established routine.'" *Thompson*, 29 F.3d at 65 (quoting *Wells*, 495 U.S. at 4, 110 S.Ct. 1632). "The existence of such a valid procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices." *Id.* (citations omitted).

 A valid inventory search routine may allow the searching officers "sufficient latitude to determine whether a particular container should or should not be opened," *Wells*, 495 U.S. at 4, 110 S.Ct. 1632, but "[t]he individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime,'" *id.* (quoting *Bertine*, 479 U.S. at 376, 107 S.Ct. 738 (Blackmun, J., concurring)). In short, "[t]he policy or practice governing inventory searches should be designed to produce an inventory." *Id.*

## B. Inevitable Discovery

 Under the inevitable discovery doctrine, "evidence that was illegally obtained will not be suppressed 'if the government can prove that the evidence would have been obtained inevitably' even if there had been no statutory or constitutional violation." *United States v. Roberts*, 852 F.2d 671, 675–76 (2d Cir.), *cert. denied*, 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 583 (1988) (quoting *Nix v. Williams*, 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). In some cases, the govern-

---

**3.** Although inventory searches typically occur at a police station or an impoundment facility, rather than at the time of the arrest, *see, e.g., Lafayette*, 462 U.S. at 641, 103 S.Ct. 2605 (police station); *Opperman*, 428 U.S. at 366, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (impoundment facility); *Wells*, 495 U.S. at 2, 110 S.Ct. 1632 (impoundment facility); *Thompson*, 29 F.3d at 64 (impoundment facility);

*United States v. Arango–Correa*, 851 F.2d 54, 59 (2d Cir.1988) (impoundment facility), the Fourth Amendment does not require that police conduct inventory searches at any particular location, *see, e.g., Colorado v. Bertine*, 479 U.S. 367, 368–69, 375–76, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (upholding inventory search performed when the suspect was taken into custody, before the tow truck arrived).

ment successfully invokes the inevitable discovery exception on the basis of inventory search procedures. In such cases, the court typically concludes that even if the invalid search had not been conducted, the evidence would nonetheless have been discovered in the course of a valid inventory search conducted pursuant to standardized, established procedures. *See, e.g., Griffiths,* 47 F.3d at 78 (remanding for further findings of fact as to whether certain evidence "would have been discovered pursuant to an established inventory policy, written or otherwise, including a specific procedure dealing with closed containers"). In these cases, we have held that the government must prove three things: (1) that the police had legitimate custody of the vehicle or other property being searched, so that an inventory search would have been justified, *see United States v. Jenkins,* 876 F.2d 1085, 1088 (2d Cir.1989) (per curiam) ("[A]ssuming that the government could have taken custody of [the defendant's] suitcase and transported it to FBI headquarters, . . . an inventory search, conducted by government agents pursuant to FBI policy, may have been permissible."); (2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to "established" or "standardized" procedures, *see Griffiths,* 47 F.3d at 78; and (3) that those inventory procedures would have "inevitably" led to the "discovery" of the challenged evidence, *see id.* at 77–78; *Jenkins,* 876 F.2d at 1088.

## V. The District Court's Legal Conclusions

The district court apparently concluded that the discovery of the evidence was proper under both the inventory search and the inevitable discovery doctrines. Under the heading "Conclusions of Law," and the subheading, "The Inevitable Discovery Doctrine," the district court stated:

Here, the government has met the burden of showing that the handgun and heroin would inevitably have been discovered through an inventory search of the Chevrolet, and that, at a minimum, the Hartford police department followed an established routine in conducting the search, notwithstanding the fact that the policy was not in writing.

*Mendez,* 139 F.Supp.2d at 280. Later, the court added: "Because Foster and Resto found the handgun and heroin by following this established, standardized routine, the court concludes that the inventory search procedure is sufficiently regulated to satisfy the Fourth Amendment." *Id.* at 281.

We think that the district court's conclusion blurs somewhat the distinction between the two doctrines. It is true that the government has made both an inventory search and an inevitable discovery argument. The government first argues that when Officers Foster and Resto discovered the handgun in the glove compartment, they were conducting a valid inventory search of the car. In the alternative, the government argues that even if the initial search of the car was unlawful, the police would inevitably have found the evidence in the course of a subsequent, valid inventory search of the car.

### A. Inevitable Discovery

The district court agreed with the government's inevitable discovery argument. So do we. The record amply supports the district court's conclusion that the Hartford Police Department had a consistent, if unwritten, inventory search policy. After the tow truck arrived, in accordance with that policy, Foster made a proper inventory search during which he completed the tow slip. Had the two officers not found the evidence during the earlier searches, they would inevitably

have found it in the course of a valid inventory search, which Foster would subsequently have made. Thus, the evidence was properly admitted under the inevitable discovery exception to the exclusionary rule.

### B. Inventory Search

At times, the district court's opinion also seems to suggest that the initial searches by Foster and Resto—i.e., the searches that actually yielded the gun, the heroin, and the bill of sale—were themselves valid "inventory searches" conducted "in good faith pursuant to 'standardized criteria ... or established routine.'" *Thompson,* 29 F.3d at 65 (quoting *Wells,* 495 U.S. at 4, 110 S.Ct. 1632). Thus, as noted, the court concluded at one point that "the government ha[d] met the burden of showing that ... at a minimum, the Hartford police department followed an established routine in conducting the search, notwithstanding the fact that the policy was not in writing." *Mendez,* 139 F.Supp.2d at 280. Later, the court stated that "Foster and Resto found the handgun and heroin by following this established, standardized routine ...." *Id.* at 281. We doubt that the police officers were conducting a valid inventory search themselves, but we do not reach this question. Like the district court, we conclude that the evidence would inevitably have been discovered in a valid inventory search. We affirm on that basis alone.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.