UNITED STATES of America,

v.

Hector CANCEL, Defendant.

15 Cr. 488(AT)

United States District Court,
S.D. New York.

Signed March 9, 2016

---

586

Gina Marie Castellano, U.S. Attorney's Office, SDNY, New York, NY, for United States of America.

Julia L. Gatto, Federal Defenders of New York Inc., New York, NY, for Defendant.

## MEMORANDUM AND ORDER

ANALISA TORRES, District Judge:

Defendant, Hector Cancel, moves, pursuant to Rule 12 of the Federal Rules of Criminal Procedure, to suppress a gun recovered by the police.

## BACKGROUND

On January 6 and 7, 2016, the Court held an evidentiary hearing. The Government presented the testimony of NYPD Officers Karon B. Porter, Modesto Acosta, and Jonathan Della Monica. Porter, who is assigned to NYPD Transit District 12 in the Bronx, has been a police officer for two-and-a-half years. Jan. 6, 2016 Hearing Transcript ("1/6/16 Tr.") 3, ECF No. 22. He has made approximately 165 arrests, the majority of which were for theft of services.[1] Id. 4, 35. Acosta has served on the police force for one-and-a-half years and is a member of the NYPD's Bronx Response Team ("BRT"). Id. 93–94. He has made approximately 35 arrests, the majority of which were for theft of services. Id. 94. Della Monica, a six-year veteran of the NYPD, has been assigned to the BRT for five-and-a-half years. Jan. 7, 2016 Hearing Transcript ("1/7/16 Tr.") 17–18, ECF No. 24. He handles administrative tasks and is a training officer. Id. Della Monica has made approximately 230 arrests, the majority of which were for theft of services. Id. 18. The Court credits the officers' testimony.

The defense did not call any witnesses.

## FACTS

On July 8, 2015, Officers Porter and Acosta, both in uniform, see Jan. 21, 2016 Govt. Opp. 3, ECF No. 27, were on patrol at the 233rd Street subway station in the Bronx, when they observed Hector Cancel walking through the emergency gate.[2] 1/6/16 Tr. 4–5, 11, 49, 96, 99. He was holding cash and a black plastic bag. Id. 11, 99. When Cancel made eye contact with Acosta, who was standing near the emergency gate about a "foot and a half" away, id. 116, Cancel "flinched" and "double[d]-back[ ] . . . as if he [were] exiting" back through the emergency gate. Id. 11–12, 53, 101, 116. The officers stopped Cancel. Id. 12–13. Porter asked Cancel why he had used the emergency gate. Id. 13. Cancel responded that the MTA employee working the booth had allowed him in. Id. 13, 36. The officers then spoke with the booth attendant, who denied authorizing Cancel's entry and stated that she had "let the lady in before him." Id. 13–14, 102. Porter and Acosta do not recall observing anyone walk through the emergency gate right before Cancel. Id. 12, 49, 53, 100, 120; 1/7/16 Tr. 12.

The officers "walked [Cancel] over to [a] bench . . . and sat him down." 1/6/16 Tr. 103; see also id. 15; Cancel Aff. 2, ECF No. 12–2. Cancel placed his plastic bag on the seat directly next to him. 1/6/16 Tr. 16. Porter then picked up the bag and moved it one seat further away from Cancel, so that there was now one empty seat separating Cancel and the bag.[3] Id. 17, 59, 62. Porter did this as "a safety proce-

---

1. See N.Y. Penal Law § 165.15.

2. According to Porter, the emergency gate, also known as the "service" gate, 1/6/16 Tr. 7, is "typically used for individuals that are carrying large items" such as "luggage, shopping carts, [and] strollers. It is also accessible for individuals who are handicapped." Id. 9; see also id. 100. To lawfully gain entry to the

subway system via the emergency gate, a person must inform the Metropolitan Transportation Authority ("MTA") employee at the booth, swipe a MetroCard at the turnstile, and wait for the booth attendant to open the gate. Id. 8–9; see also Govt. Ex. 6.

3. Each seat on the bench measures about 21 inches wide. 1/6/16 Tr. 61; Def. Ex. C3.

dure" that he "instilled in [him]self. . . . [A]s a cop looking at an individual, we don't know what is in their bag. It is a safety thing because at the end of the day, I am trying to go home[.]" *Id.* 17–18. Porter moved the bag "to a place where it [was] hard to reach[.]" *Id.* 63. Porter testified that Cancel, who was not yet handcuffed, could "still reach" the bag, "but if he [were] to reach it, [Porter] would see and have a decent amount of response time." *Id.* 62–63; *see also id.* 18, 104–05.

At Porter's request, Cancel produced his identification card. *Id.* 19. Porter observed a "metal clip" on Cancel's pocket, and asked him if he had anything on him that Porter "need[ed] to know about." *Id.* 19–20. Cancel responded that he had a knife, and handed it to Porter. *Id.* 20, 64. Porter asked Cancel why he had a knife; Cancel explained that he was a vendor, and that "the knife [was] not functioning[.]" *Id.* 20. Porter placed the knife "with the bag" on the bench. 1/7/16 Tr. 34. Porter testified that he would have the same safety concerns about the knife that he had about the bag and that, if a suspect "had a knife, you wouldn't want that knife to be in reachable distance to [that] person." 1/6/16 Tr. 66.

Porter then called his precinct and asked Della Monica to "run" Cancel's name. *Id.* 21; 1/7/16 Tr. 19. Della Monica entered Cancel's name and date of birth into a database called "Host On–Demand," which reports "whether the person has a warrant, [is a] [t]ransit recidivist or anything like that." 1/7/16 Tr. 19–20, 25–27. He examined Cancel's rap sheet by "running the NYSID," or "New York State Identification Number." *Id.*; Jan. 21, 2016 Govt. Opp. 6. From this records check, Della Monica determined that Cancel was a transit recidivist,[4] and told Porter to "bring [Cancel] in." 1/6/16 Tr. 21; 1/7/16 Tr. 7, 27, 32. Porter testified that he "understood that to mean that [he was] going to have to place the defendant under arrest." 1/6/16 Tr. 21. After getting off the phone with Della Monica, Porter stated to Cancel, "we'll have to bring you in. [Cancel] then looked at [Porter] and said, You know what time I am going to be out? [Porter] said, Listen, it is still early. It is about 2:00 [p.m.] right now. You'll probably be out by 2:00 a.m." *Id.* 22.

Acosta handcuffed Cancel with his hands behind his back and patted him down. *Id.* 22, 107. Cancel remained on the bench. *Id.* 80. Porter "search[ed] the outer [perimeter]" of Cancel's black plastic bag by "do[ing] a little pat, feel and squeeze [of] the outer [perimeter]." *Id.* 23. As Porter did this, Acosta was "focused" on Cancel, 1/7/16 Tr. 3, and the bag was "enough distance from" Cancel such that "if he or anyone was to lunge at the bag, [Porter would] have enough time to react." 1/6/16 Tr. 80. When asked why he felt Cancel's bag, Porter testified: "Because I know that this individual is about to be put into a department vehicle, . . . with either other defendants or other police officers or police personnel. . . . [I]t is a safety measurement that this bag might be around other people and it might be around the defendant while we transport the defendant back to our command." *Id.* 24–25. Porter testified that, based on his experi-

---

4. The NYPD "transit recidivist database" was established "[i]n an effort to identify persons likely to commit crimes in the transit system or persons who routinely violate transit rules and disregard notices to appear at the Transit Adjudication Bureau[.]" Broken Windows and Quality–of–Life Policing in New York City at 15, ECF No. 17–1. "A person stopped for a violation of transit rules who is identified as a transit recidivist is ineligible for a civil notice and must be arrested for the offense." *Id.* Criteria for being included in the transit recidivist database include, among other things, a "weapons arrest within NYC in the last four years." *Id.; see also* 1/7/16 Tr. 21; Govt. Ex. 17.

ence handling his off-duty and service weapons, "[o]nce [he] was feeling" the bag, he "pretty much felt like it was a gun." *Id.* 25. Porter "then opened up the bag and [ ] went directly toward the hard substance or object that [he] was feeling." *Id.* He "found another bag within the [ ] bag and [ ] found a black shirt wrapped around a gun." *Id.*; *see* Govt. Ex. 7 (photograph of bag and black shirt). Both bags "were basically black shopping bags, grocery store bags." 1/6/16 Tr. 26. In addition to the gun, Porter found, among other things, "a lot of CDs." *Id.*; Govt. Ex. 16 (NYPD property clerk invoice stating that 33 compact discs in Cancel's possession were "vouchered for safekeeping," along with other items including a portable speaker, headphones, and a cell phone).

Throughout his encounter with the officers, Cancel was "surround[ed]" and "flanked" by Porter and Acosta, who were both armed. 1/6/16 Tr. 82; *see also id.* 16. No other person was "around the bench." *Id.* 87. The officers testified that Cancel was "cooperative," "cordial," "compliant," "dutiful[ ]," "respectful," and "polite," and gave no indication that he was likely to behave in a violent manner. *Id.* 20, 30, 58–59, 81, 106, 109; *see also id.* 22 ("Q. Did the defendant resist arrest at all? A. Not at all."), 107 (same).

Cancel was transported to Transit District 12 in a police vehicle with three police officers: Porter's "regular partner," Officer Martinez, *id.* 69, who was driving; Porter's supervisor, Sergeant Rodriguez,

in the passenger seat; and Porter, who was seated in the back of the vehicle with Cancel. *Id.* 30. At the precinct, all of Cancel's property was "looked through." *Id.* 88; *see also id.* 31–32. Acosta and Porter vouchered some of these items, including "a lot of CDs," a cell phone, a "portable music player device," and cash. *Id.* 31–32. Some of Cancel's belongings were not inventoried or vouchered and Cancel was allowed to keep them on his person, including one hundred dollars in cash, his I.D. card, and his baseball cap. *Id.* 72, 87. Porter testified that Cancel was permitted to keep them because "during processing at Bronx central booking those items are ... not considered items that an individual is not allowed to have." *Id.* 87–88. Porter also stated that "you don't have to seize everything. You can, but you don't have to take every[ ] single property." *Id.* 73. However, even if some belongings were returned to Cancel, they were "still looked through and identified[.]" *Id.* 88. The "proper procedure[s]" for seizing and inventorying property, whether it is arrest evidence or personal property, are set forth in the NYPD Patrol Guide.[5] *Id.* 74.

## CONCLUSIONS OF LAW

Cancel moves to suppress the gun on the grounds that: (1) Cancel's arrest for theft of services was not supported by probable cause; (2) Porter's post-arrest warrantless search of Cancel's bag violated the Fourth Amendment; (3) the Govern-

---

5. For example, NYPD Patrol Guide Procedure No. 218–13, titled "Inventory Searches of Automobiles and Other Property," states that "[p]roperty that is ... possessed or under the control of an arrested individual, may be inventoried and all items found therein may be invoiced as prisoner's property." Def. Ex. D at HC000090. Procedure No. 208–05, titled "Arrests—General Search Guidelines," states that, "[u]pon arrival at precinct of arrest or other Department facility, the arresting officer ... shall conduct a thorough search of the prisoner's person and clothing to ensure the safety of all persons within the facility and to remove weapons, contraband, and evidence not discovered by the frisk.... A search at a police facility ... includes the removal of outer garments such as overcoats, jackets, sweaters, vests, hats, wigs, ties, belts, shoes and socks, handbags, and wallets." Govt. Ex. 22 at HC000083.

ment failed to carry its burden of establishing "inevitable discovery"; and (4) the initial seizure of the bag, even before the arrest, also violated the Fourth Amendment. *See* Oct. 20, 2015 Def. Mem. 1, ECF No. 12; Nov. 10, 2015 Def. Reply 3–4, ECF No. 15; 1/7/16 Tr. 49–53.

### A. Probable Cause

■■■ An officer has probable cause to make an arrest when the officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (citations omitted). In determining whether probable cause existed, courts must examine the "totality of the circumstances" and "consider those facts available to the officer at the time of the arrest and immediately before it." *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006) (internal quotation marks and emphasis omitted).

Under the New York Penal Law, a person is guilty of theft of services when, "[w]ith intent to obtain railroad, subway, bus, air, taxi or any other public transportation service without payment of the lawful charge therefor, ... he obtains or attempts to obtain such service ... by force, intimidation, stealth, deception or mechanical tampering, or by unjustifiable failure or refusal to pay[.]" N.Y. Penal Law § 165.15.

■■■ The Court concludes that Porter and Acosta had probable cause to arrest Cancel for theft of services. There is no dispute that Cancel entered the subway station through the emergency gate without paying the fare. *See, e.g.,* 1/7/16 Tr. 50. When the officers approached him and asked why he had entered that way, Cancel stated that the MTA booth attendant had let him in. *See* 1/6/16 Tr. 13, 36. The officers testified that they then confirmed with the booth employee that she had not authorized Cancel's use of the emergency gate. *Id.* 13–14, 102.

Cancel contends that inconsistencies between the officers' testimony and certain documentary evidence suggest that Porter and Acosta do not remember whether they spoke with the booth attendant. 1/7/16 Tr. 51–52. For example, Cancel points out that: (1) the officers did not record the purported conversation in their memo books, *id.* 52, 1/6/16 Tr. 42; and (2) the criminal complaint filed by the Bronx District Attorney the day after the arrest did not mention the conversation. 1/6/16 Tr. 38, 41; Def. Ex. B (state court complaint). Indeed, Porter admitted that he did not tell the Assistant District Attorney about the conversation when he met with her on the day of the arrest. 1/6/16 Tr. 45, 47. Porter also testified that the state court complaint, which he signed, "includ[es] all the facts that [he] knew about this case at the time it was drafted[.]" *Id.* 84–85; *see also id.* 38. Cancel further notes that, although the federal criminal complaint in this case alleges that only Acosta spoke with the booth attendant, Porter testified at the hearing that he also had spoken with the booth employee. *See* 1/7/16 Tr. 51–52; Compl., ECF No. 1; *see also* 1/6/16 Tr. 119.

The Court finds that these minor gaps in the record do not undermine its conclusion that the officers testified credibly, and holds that the material facts—that the officers confirmed with the booth attendant that Cancel was not given permission to enter via the emergency gate—establish that there was probable cause for the arrest of Cancel for theft of services.

### B. Post–Arrest Warrantless Search

#### 1. Search Incident to Arrest

■■■ Warrantless searches incident to arrest are justified based on "interests in

officer safety and evidence preservation that are typically implicated in arrest situations." *Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). "[A] search incident to arrest may only include 'the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.' " *Id.* at 339, 129 S.Ct. 1710 (citation omitted). This limitation on the search-incident-to-arrest exception to the warrant requirement "ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Id.* Thus, "[w]here the item to be searched is not within reasonable reach of the person arrested, the rationale for application of this exception is absent." *United States v. Perea*, 986 F.2d 633, 643 (2d Cir.1993). Therefore, "[t]o determine whether a warrantless search incident to an arrest exceeded constitutional bounds, a court must ask: was the area in question, at the time it was searched, conceivably accessible to the arrestee—assuming that he was neither an acrobat [nor] a Houdini?" *United States v. Lyons*, 706 F.2d 321, 330 (D.C.Cir.1983) (internal quotation marks and citations omitted).

■ Here, the Government contends that Porter's search of Cancel's bag was a lawful search incident to arrest because the bag was within Cancel's "immediate control or grab area." Jan. 21, 2016 Govt. Opp. 2. The Court disagrees. Porter conducted the search while Cancel, handcuffed behind his back, remained at least one bench seat away from the bag, with Acosta "focused" on Cancel. 1/6/16 Tr. 23, 80; 1/7/16 Tr. 3. At all times, Cancel was "flanked" and "surround[ed]" by Porter and Acosta, who were both armed. 1/6/16 Tr. 82; *see also id.* 16; *United States v. Blue*, 78 F.3d 56, 60 (2d Cir.1996) (citations

omitted) ("[I]n determining whether or not an area is within the arrestee's 'immediate control,' . . . we consider not only the arrestee's location, but also the nature of any restraints that have been imposed upon the person[.]").

The Court recognizes that custodial arrests are often dangerous and that, in the heat of an arrest, "police must act decisively and cannot be expected to make punctilious judgments regarding what is within and what is just beyond the arrestee's grasp." *Lyons*, 706 F.2d at 330. Moreover, as some courts have concluded, "it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach[.]" *United States v. Shakir*, 616 F.3d 315, 320–21 (3d Cir.2010) (quoting *United States v. Sanders*, 994 F.2d 200, 209 (5th Cir.1993)). However, in this case, Porter testified that Cancel could not reach the bag while handcuffed, and was far enough away from the bag that he could not reach it. 1/6/16 Tr. 81 ("Q. He [Cancel] can't reach it; right? A. In cuffs, no. He cannot reach it in cuffs."), 82 ("Q. [Cancel is] [f]ar enough away [from the bag] that he cannot reach it? A. Correct."). Indeed, even before Cancel was arrested and handcuffed, upon retrieving a knife from Cancel's person, Porter placed the knife with the bag on the bench, and testified that he did this due to "safety concerns," because "you wouldn't want that knife to be in reachable distance[.]" *Id.*; 1/7/16 Tr. 34.

Further, according to their testimony, Porter and Acosta did not suspect that Cancel had committed a crime in addition to theft of services, possessed a weapon in addition to the knife, or intended to flee. *See* 1/6/16 Tr. 47, 81 ("Q. [T]here is nothing about your interaction with Mr. Cancel that would indicate that he would put you or your partner in danger; correct? . . .

A. [A]s far as my experience with him, no, there was no indication that he would."), 82. The officers had no reason to believe that Cancel possessed a gun until after Porter searched Cancel's bag. *See, e.g., id.* ("Q. When you frisk that bag before you feel the gun, the only thing you suspect Mr. Cancel of doing, the offense he commits is theft of services for not paying his MTA fare? A. Correct."). Porter testified that, when he moved the bag from where Cancel had originally placed it, "it had weight to it," such that it could have been "a bag of chips and soda can," or "two liters of Pepsi bottles." *Id.*; *see also id.* ("Q. You have no idea what is in the bag at that point? A. Correct. Q. It looks like a bag from a grocery store or bodega; correct? A. Correct. Q. Could be a can of soda. A. Could be anything."). In addition, there is no ·dispute that, throughout the encounter, Cancel was compliant and courteous. *See id.* 20, 30, 58–59, 81 ("He was compliant at all times."), 106, 109. It is also clear that Cancel never made an attempt to reach the bag, nor did he ask for it. These facts provide an "objective basis upon which to conclude that the arresting officer had no reason to fear either the arrestee or the environment in which the arrest unfolded[.]" *United States v. Abdul–Saboor*, 85 F.3d 664, 670 (D.C.Cir. 1996).

Moreover, the search of Cancel's bag at the time of his arrest could not have been justified by a need to prevent the destruction of evidence, because Cancel was under arrest for theft of services and there was no basis to believe there could be evidence of that crime in the bag. *See, e.g., Gant*, 556 U.S. at 343, 129 S.Ct. 1710 ("In many cases, as when [an individual] is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence."); *United States v. Morillo*, No. 08 CR 676, 2009 WL 3254431, at *5 (E.D.N.Y. Oct. 9, 2009) (finding officers "had no reason to think that evidence of a crime was in [the arrestee's] backpack. And because the officers arrested [him] for illegally riding his bicycle on the sidewalk there could be no evidence of that specific crime in his backpack.").

Because the officers could not reasonably have believed that Cancel had access to the bag when Porter searched it—and Porter conceded that Cancel, while handcuffed, could not reach the bag, and gave the officers no reason to fear that he would even attempt to do so—the Court holds that the seizure of the gun did not arise from a lawful search incident to arrest. *See Gant*, 556 U.S. at 343, 129 S.Ct. 1710. To conclude otherwise would "untether" the search-incident-to-arrest exception from the justification underlying it—*i.e.,* officer safety and evidence preservation. *Id.*; *see also, e.g., Shakir*, 616 F.3d at 321 (requiring "something more than the mere theoretical possibility that a suspect might access a weapon or evidence").

## 2. Exigent Circumstances

The Government also argues that the fact that Cancel's bag was to be transported, along with Cancel, in a NYPD vehicle, created an exigency justifying Porter's search of the bag. *See* 1/7/16 Tr. 44. Under the "exigent circumstances" exception to the warrant requirement, "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). Indeed, the Supreme Court "has recognized only a few such emergency conditions," and hesitates to find exigent circumstances particularly "when the underlying offense for which there is probable cause to arrest is relatively minor." *Id.*; *see also id.* at 753, 104 S.Ct. 2091 ("[A]n important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made.").

■ The Supreme Court has noted that a warrantless search of luggage taken from a suspect at the time of arrest may be justified if "officers have reason to believe [it] contains some immediately dangerous instrumentality, such as explosives," because "it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon." *United States v. Chadwick*, 433 U.S. 1, 15 n.9, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).[6] However, "officers must have more than a mere hunch or suspicion before an exigency can excuse the necessity for" a warrant. *United States v. Bates*, 84 F.3d 790, 795 (6th Cir.1996); *see also United States v. Restrepo*, 890 F.Supp. 180, 207 (E.D.N.Y. 1995) (rejecting application of exigency exception where warrantless search was justified on "law enforcement officials' speculative belief" and "mere conjecture" that exigency existed).

■ When asked why he felt Cancel's bag, Porter testified that he knew "that this individual is about to be put into a department vehicle, [ ] with either other defendants or other police officers or police personnel.... [I]t is a safety measurement that this bag might be around other people and it might be around the defendant while we transport the defendant back to our command." 1/6/16 Tr. 24–25. He also testified that, based on NYPD practice and procedure, officers would search the bag of an individual arrested in a subway station pursuant to "[s]afety protocol to ensure there are no weapons[,] anything that can fall out of the bag while it is in transport, but also because we're responsible for the defendant or anybody's personal property." *Id.* 111. When asked if he could have secured the bag away from the defendant during transport, Porter testified that "[i]t really depends[.] The only reason why because I don't know what vehicle was picking me up. It could be a van or a department car[.]" *Id.* 78. Porter agreed, however, that "[n]o matter what the vehicle, it is easy enough not to put the bag in the lap of the defendant on the way to the precinct," and that it "[c]ould be" "easy enough to keep it in the front" of the vehicle. *Id.* Porter also stated that the bag would probably have fit in the vehicle's glove compartment. *Id.* 79. As it turned out, Cancel was transported in a police vehicle with three police officers, including Porter seated in the back with Cancel. *Id.* 30. Based on these facts, the Court finds that the Government has not met its heavy burden here. Given, the minor crime for which Cancel was arrested, his utterly compliant behavior, and the absence of any indication that Cancel "would put [him] or [Acosta] in danger," *id.*, Porter had no reason to believe that Cancel's bag contained something dangerous that could not be safely transported to the precinct. *Cf. Morillo*, 2009 WL 3254431, at *7 (finding "special exigency" justified warrantless search of backpack before its transport in police car where arrestee's "furtive and

---

**6.** Though *Chadwick* concerned a search of luggage, courts have found a reasonable expectation of privacy in unsealed containers such as plastic bags. *See, e.g., United States v. Doe*, 801 F.Supp. 1562, 1584–85 (E.D.Tex. 1992) (finding translucent white plastic bag in which gun was found was a " 'closed container' in which defendant possessed a reasonable expectation of privacy," because, among other things, the officer who searched the bag "did not testify that he could see the shape of the gun or of any other item contained within the bag through the bag."); *cf. United States v. Mannino*, 487 F.Supp. 508, 514 (S.D.N.Y. 1980) (finding no reasonable expectation of privacy in white plastic bag where officers "had probable cause to believe [it] contained either controlled substances or handguns.").

evasive behavior gave the officers reason to believe he was hiding something potentially dangerous in his backpack at the time of his arrest.").

Accordingly, the Court holds that the seizure of the gun was not justified by an exigent circumstance.

### C. Inevitable Discovery

The Government argues that even if the seized gun is not admissible pursuant to the exceptions discussed above, it would still be admissible under the inevitable discovery doctrine. Specifically, the Government contends that, "pursuant to standard NYPD procedure, the [f]irearm would have been inevitably discovered because, upon [Cancel's] arrest, [Cancel's] black plastic bag and its contents would have been transported to Transit District 12, vouchered, and inventoried." Jan. 21, 2016 Govt. Opp. 9.

 Under the "inevitable discovery" doctrine, evidence that is obtained during the course of an unreasonable search and seizure will not be suppressed "if the government can prove that the evidence would have been obtained inevitably" without the constitutional violation. *Nix v. Williams*, 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The inevitable discovery doctrine is applied only where a court can find with "a high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have oc-

curred." *United States v. Heath*, 455 F.3d 52, 55, 59 (2d Cir.2006). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *Nix*, 467 U.S. at 444 n. 5, 104 S.Ct. 2501.[7] The Government must "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[.]" *Id.* at 444, 104 S.Ct. 2501.

 The Government contends that the gun would have been inevitably discovered during a legal inventory search of Cancel's black plastic bag after it was brought to the police precinct. An inventory search is "an incidental administrative step following arrest and preceding incarceration" that "constitutes a well-defined exception to the warrant requirement." *Illinois v. Lafayette*, 462 U.S. 640, 643–44, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); *see also id.* at 646, 103 S.Ct. 2605 ("At the stationhouse, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed."). Where the police lawfully take personal property into their custody, they are permitted to conduct an inventory search of the property without a warrant or probable cause to believe it contains contraband.[8] *United States v. Lopez*, 547 F.3d

---

**7.** *See also United States v. Eng*, 971 F.2d 854, 862 (1992) (finding IRS agent's "testimony as to what he would have done or how he would have behaved, while deserving of careful consideration as part of the analysis, is not necessarily conclusive on the question of whether a particular piece of evidence inevitably would have been found through lawful means had [the defendant's property] never been searched.... An objective analysis is required.").

**8.** Inventory searches "are deemed reasonable under the Fourth Amendment because [they] serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir.1994) (internal quotation marks and citation omitted). *See also* Def. Ex. D at HC000089 (N.Y.PD Patrol Guide Procedure No. 21813, titled "Inventory Searches of Automobiles and Other Property," stating that purpose of inventory searches is "[t]o protect

364, 369 (2d Cir.2008). "In some cases, the government successfully invokes the inevitable discovery exception on the basis of inventory search procedures. In such cases, the court typically concludes that even if the invalid search had not been conducted, the evidence would nonetheless have been discovered in the course of a valid inventory search conducted pursuant to standardized, established procedures." *United States v. Mendez*, 315 F.3d 132, 137–38 (2d Cir.2002).

 In these cases, the Government must establish the following elements:

(1) that the police had legitimate custody of the vehicle or other property being searched, so that an inventory search would have been justified;

(2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to "established" or "standardized" procedures; and

(3) that those inventory procedures would have "inevitably" led to the "discovery" of the challenged evidence.

*Id.* at 138.

 Cancel does not challenge the first element, which the Court finds to be satisfied. *See Perea*, 986 F.2d at 643 (internal quotation marks omitted) ("When a person is arrested in a place other than his home, the arresting officers may impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area."). Therefore, the Court addresses the second and third elements in turn.

### 1. Inventory Search Procedures

Under the second element of the *Mendez* test, the Court must consider whether the inventory search was conducted pursu-

ant to "established" or "standardized" procedures. *Mendez*, 315 F.3d at 138. The established or standardized procedures "may be proven by reference to either written rules and regulations or testimony regarding standard practices." *Id.* at 137 (internal quotation marks omitted).

Porter and Acosta testified that they received training on how to conduct an inventory of an arrestee's property, and that based on their training and experience, officers "have to voucher [an arrestee's] property for safekeeping." 1/6/16 Tr. 30, 109. According to the officers, this is "standard NYPD police procedure." *Id.* 31, 109. Porter also testified that "[v]ouchering means you have to go through an individual's belongings and itemize each item that an individual has and then provide that individual with a receipt so that they can come back later to pick up their belongings." *Id.* 31. Porter and Acosta testified that, pursuant to NYPD practice and procedure, if an individual is arrested in a subway station with a bag, officers would "look into the person's belongings and itemize each item and voucher it." *Id.* 89, 111; *see also* 1/7/16 Tr. 5 (Acosta testifying that his training requires him to voucher property that is not necessarily on the arrestee). Porter testified that even items returned to the arrestee would still be identified, though not "on paper." 1/6/16 Tr. 89.

Similarly, Della Monica testified that he also has received training on how to conduct an inventory of an arrestee's property, and that he has trained other officers on the procedure. 1/7/16 Tr. 22–23. Della Monica stated that, based on his training and experience, "[a]ll property of anyone arrested is invoiced ... [for] safekeeping or arrest evidence." *Id.* 23. He also said that if an individual is arrested in a sub-

---

property, ensure against unwarranted claims of theft, and protect uniformed members of

the service and others against dangerous instrumentalities.").

way station with a bag, pursuant to NYPD policy, "[t]he bag would come back with the defendant and be invoiced." *Id.* Della Monica explained that "invoiced" means "that all their property ... would be logged into the system to show that they had it on their [person]." *Id.* The invoice would include any contents of the bag— "[y]ou would have to label everything individually that is in the bag." *Id.* 23–24. Like Porter and Acosta, Della Monica testified that this is standard police practice. *Id.* 24.

The Court finds that the consistent testimony of Porter, Acosta, and Della Monica on these inventory procedures, taken together with those outlined in the NYPD's Patrol Guide,[9] establish the existence of a standardized inventory procedure. *Cf. United States v. Duguay,* 93 F.3d 346, 351–52 (7th Cir.1996) (holding that inconsistent testimony of police officers failed to establish the existence of a standardized impoundment procedure). In accordance with those procedures, Porter and Acosta inventoried and vouchered Cancel's belongings, which included, among other things, 33 compact discs found in the black plastic bag. 1/6/16 Tr. 31–32; Govt. Ex. 16; *see Mendez,* 315 F.3d at 138–39.

### 2. Inevitability of Discovering Seized Evidence

The final element of the *Mendez* test is whether the standardized inventory procedures would have inevitably led to the discovery of the seized evidence. *Mendez,* 315 F.3d at 138.

Porter testified that, if he had not retrieved the gun at the subway station, Cancel's bag "would have been opened up during vouchering to be processed," and, therefore, the firearm inevitably would have been lawfully discovered. 1/6/16 Tr. 32–33. Cancel disputes inevitability, arguing that: (1) the officers "could have permitted a family member or friend to retrieve [Cancel's] belongings at the precinct"; and (2) Cancel could have been issued a Desk Appearance Ticket ("DAT") instead of being formally arrested, which would have allowed him to leave the precinct with all of his personal belongings. Jan. 21, 2016 Def. Mem. 14–15, ECF No. 26; 1/6/16 Tr. 71.

The Court disagrees.

First, Porter and Acosta testified that it would be inconsistent with NYPD procedures to give the property of an arrested individual to a family member or friend in lieu of inventorying the property. 1/6/16 Tr. 73 (Porter testifying that it would be "improper" to give an arrestee's property to a friend or family member rather than inventorying it); *id.* ("It has been my experience to properly voucher that person's belongings and not give them to anyone that is on the scene."); 1/7/16 Tr. 5 (Acosta testifying, "Q. You['ve] never seen anyone come to the precinct to retrieve personal property? A. Not under my arrests, ma'am.... It is because my training requires me to voucher everyone's property."). In addition, Cancel was not accompanied by friends or family during his arrest, transport, or processing at the pre-

---

**9.** *See* Def. Ex. D at HC000090 (NYPD Patrol Guide Procedure No. 218–13, titled "Inventory Searches of Automobiles and Other Property," stating that "[p]roperty that is ... possessed or under the control of an arrested individual, may be inventoried and all items found therein may be invoiced as prisoner's property."); *see also United States v. Morillo,* No. 08 CR 676, 2009 WL 3254429, at *15 (E.D.N.Y. Aug. 12, 2009) ("[D]espite the fact that the word 'may' appears in the Patrol Guide and could imply that an inventory search is discretionary, [the officer] clearly testified that his regular practice, as well as the policy of the NYPD, is to perform an inventory search subsequent to every arrest.").

cinct, and there is no indication that any-one intended to join him at the station-house in order to retrieve his belongings. 1/6/16 Tr. 110; *see also Morillo*, 2009 WL 3254429, at *15 ("[I]n this case, defendant had no friend or family member at the scene and, therefore, the officers had no choice but to take the backpack to the precinct. Moreover, [the officer] testified that even if someone had been present, his practice is to perform an inventory search before returning any property to a defendant or a third party, because it is necessary to know exactly what property is being returned.").

Second, the evidence does not support the conclusion that Cancel was eligible for a DAT. "[A]lthough by its nature inevitable discovery analysis inevitably involves some degree of speculation," the exception "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *Eng*, 971 F.2d at 861. Porter testified that he arrested Cancel for theft of services after Della Monica told him to "bring him in," which Porter understood to mean that he was obligated to arrest Cancel. 1/6/16 Tr. 21; *see also* 1/7/16 Tr. 7. Della Monica in turn testified that he told Porter to bring Cancel in after determining that Cancel was a transit recidivist. 1/7/16 Tr. 26–28, 32. Although, "[d]epending on their history," some transit recidivists are issued a DAT, *id.*, Govt. Ex. 17, officers have no discretion to issue a DAT to others and instead must formally arrest the individual. 1/6/16 Tr. 70–71; *see also* 1/7/16 Tr. 30 (Della Monica testifying that "[w]e always have to run a NYSID," which produces an individual's criminal history, "to determine if they are eligible for a [DAT]."). Here, the record indicates that Porter, based on his conversation with Della Monica, determined that Cancel was not entitled to a DAT. Porter's ensuing conversation with

Cancel also supports this conclusion. After Porter got off the phone with Della Monica, Porter informed Cancel that he would be arrested and brought to the stationhouse. 1/6/16 Tr. 22. Cancel asked Porter what time he would be "out," and Porter explained: "Listen, it is still early. It is about 2:00 [p.m.] right now. You'll probably be out before 2:00 a.m." *Id.* Having estimated that Cancel would not be released for 12 hours, clearly, Porter did not expect that Cancel would go to the precinct and be issued a DAT, a process which would have taken far less time.

Accordingly, the Court concludes, with a "high level of confidence," that the Government has established by a preponderance of the evidence that the gun would have inevitably been "obtained by lawful means." *Heath*, 455 F.3d at 59–60 (citations omitted). Had the two officers "not found the evidence during the earlier search, they would inevitably have found it in the course of a valid inventory search, which [they] would subsequently have made. Thus, the evidence was properly admitted under the inevitable discovery exception to the exclusionary rule." *Mendez*, 315 F.3d at 138–39.

#### D. Initial Seizure of the Bag

Cancel argues that his black plastic bag was seized when it was moved one additional bench seat away from him prior to his arrest. The Government contends that Porter's movement of Cancel's bag one bench seat over did not constitute a seizure under the Fourth Amendment because it did not interfere with Cancel's possessory interest in the bag. Jan. 21, 2016 Govt. Opp. 9. Because the Court concludes that the gun would inevitably have been discovered in a valid inventory search following Cancel's lawful arrest, the Court does not reach this question. *See Wong Sun v. United States*, 371 U.S. 471, 488, 83

S.Ct. 407, 9 L.Ed.2d 441 (1963) (citation omitted) ("[T]he more apt question," in determining whether to suppress evidence arguably obtained through government misconduct, is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality[.]"); *see also Hudson v. Michigan*, 547 U.S. 586, 592–93, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006).

## CONCLUSION

For the reasons stated above, Cancel's motion to suppress is DENIED. The Clerk of Court is directed to terminate the motion at ECF No. 11.

SO ORDERED.