WILLIAM F. KUNTZ, II, United States District Judge:
Defendant David White ("Defendant") seeks the suppression of evidence, including a firearm and ammunition, which he alleges was obtained illegally and in violation of the protections of the Fourth Amendment. The Government argues that the search at issue was lawful. The Government also argues that, in any event, the evidence is admissible pursuant to the inevitable discovery doctrine. For the reasons discussed below, the Defendant's motion to suppress is DENIED.
BACKGROUND
On June 23, 2017, the Defendant was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 3551 et seq. ECF No. 8. On July 5, 2017, the Defendant was arraigned before Magistrate Judge Peggy Kuo and entered a plea of not guilty. ECF No. 10. On September 15, 2017, the Defendant filed a motion to suppress evidence pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C). ECF No. 18 ("Def. Mot. to Suppress"). Specifically, the Defendant seeks to suppress a firearm, ammunition, and all other tangible evidence obtained as a result of what the Defendant contends was an illegal car search that occurred in the early morning hours on May 31, 2017. Id. at 1-2. On September 29, 2017, the Government filed its opposition to the Defendant's motion to suppress. ECF No. 23 ("Gov't *454 Opp."). This Court held a suppression hearing on November 3, 2017, during which the Government presented two witnesses: New York Police Department ("NYPD") Officer Philip Tantillo and NYPD Lieutenant Matthew Cahill, two of the officers involved in the May 31, 2017 search at issue. See November 3, 2017 Suppression Hearing Transcript ("Tr."). The Court finds the testimony of the two officers credible. The Court also notes that video footage of the incident is consistent with their testimony. See Gov't Ex. 1. The Defendant did not present any witnesses at the hearing. Following the suppression hearing, the Government submitted a post-hearing brief on December 15, 2017, ECF No. 32 ("Gov't Post-Hr'g Br."), and the Defendant submitted a post-hearing brief on December 16, 2017, ECF No. 33 ("Def. Post-Hr'g Br."). On December 22, 2017, both the Government and the Defendant submitted proposed findings of fact and conclusions of law. ECF No. 34 ("Gov't Proposed Findings") & ECF No. 35 ("Def. Proposed Findings").
FINDINGS OF FACT
On May 31, 2017, at approximately 1:50 A.M., NYPD Officer Philip Tantillo and Lieutenant Matthew Cahill,[1] who at the time were both members of the 73 rd Precinct anti-crime team, were on patrol in an unmarked police vehicle near the vicinity of 337 Bristol Street when they observed a black Honda Accord parked in front of a fire hydrant, a violation of the New York State Vehicle and Traffic Law. Tr. 5:7-7:9; 47:9-48:14. Lieutenant Cahill testified that the engine was running. Tr. 83:9-10. When asked why he was there, the Defendant stated that he was waiting for his girlfriend. Tr. 50:23-25; 70:5-6. Both officers testified that the Defendant was sitting behind the steering wheel of the vehicle and they each smelled marijuana. Tr. 7:4-6; 48:10-49:10; 67:20-23; 69:10-12. Officer Tantillo testified that, upon making these observations, he approached the Defendant and asked him for identification. Tr. 7:10-21. Lieutenant Cahill approached the passenger side of the car. Tr. 48:16-19. Officer Tantillo then gave the Defendant's identification to Lieutenant Cahill, who ran a check on it. Tr. 8:8-14; 11:8-12; 49:15-50:14. Officer Tantillo questioned the Defendant about an NYPD "PCT" shirt on his dashboard, which Officer Tantillo testified is the uniform shirt worn by members of the NYPD communications section. Tr. 10:19-11:7. The Defendant stated that his girlfriend worked for the NYPD, but the officers later learned from the Defendant's girlfriend that she worked for the Post Office, not the NYPD. Tr. 11:5-7; 30:17-20; 71:22-72:5. The Defendant had apparently placed the shirt there hoping he would not get a ticket for parking in front of a fire hydrant. Tr. 10:23-25.
Shortly thereafter, Lieutenant Cahill informed Officer Tantillo that the Defendant had been driving with a suspended license, a misdemeanor under the New York State Vehicle and Traffic Law. Tr. 11:19-12:1; 51:17-52:10. Officer Tantillo asked the Defendant to step out of the vehicle, but instead of complying with Officer Tantillo's order, the Defendant "rolled up the window and locked the doors" and said that he would not leave the vehicle. Tr. 12:2-8; 52:11-21. Officer Tantillo testified that he and Lieutenant Cahill informed the Defendant that if he did not comply, the officers would call the Emergency Services Unit. Tr. 13:1-4. During this time, the Defendant "was removing a jacket that he had on and he was moving around a lot, reaching underneath the front seat, the back seat, just lunging all around the car." Tr. 13:6-8; 33:11-19. Lieutenant Cahill testified *455 that the Defendant "was making slight movements in the car, reaching under the seat of the car." Tr. 52:12-21. Officer Tantillo testified that although he called for the Emergency Services Unit, they did not arrive. Tr. 13:9-15. Instead, Sergeant Simms, another NYPD officer who was the patrol supervisor, arrived. Tr. 13:16-19; 35:23-36:3; 53:2-7. Sergeant Simms also instructed the Defendant to keep his hands on the steering wheel or on the dashboard, but the Defendant did not comply. Tr. 13:21-25; 53:9-19. Officer Tantillo testified that Sergeant Simms then used his ASP-an expandable metal baton-to break the driver's side window, at which point Lieutenant Cahill opened the door and the officers removed the Defendant from the vehicle, handcuffed him, and placed him near the back bumper of the vehicle. Tr. 14:9-15:23. Because the Defendant did not want to be seen by the public in handcuffs, the Defendant asked Officer Tantillo if he could put his hands against the back of the car, and Officer Tantillo complied. Tr. 17:23-18:3. Officer Tantillo testified that the Defendant also stated, "you already know what it is." Id.
Lieutenant Cahill testified that after the officers had removed the Defendant from the vehicle, Lieutenant Cahill searched the Defendant's person for the car keys so that the officers could remove the car from the scene. Tr. 54:4-55:6. Lieutenant Cahill testified that it was necessary to move the car because the driver's side window was broken, the car was still parked in front of a fire hydrant, and it was accessible for someone to steal the vehicle. Tr. 54:25-55:6. Having not found the car keys on the Defendant's person, Lieutenant Cahill then searched the vehicle itself for the keys, including the front and rear driver's side of the car, but to no avail. Tr. 54:22-56:11. He then checked the passenger's side of the car. Tr. 56:14-15. Lieutenant Cahill testified that he was looking in the rear passenger side of the car when he noticed a light jacket that the Defendant had placed in the back seat. Tr. 56:18-21. Lieutenant Cahill testified that when he attempted to move the jacket, he felt a weight inside of the jacket. Id. When he shined his flashlight on the jacket, he saw there was a gun in the pocket of the jacket. Tr. 56:24-57:1. At that point, Lieutenant Cahill testified that he stepped out of the car and signaled to Officer Tantillo he had found something inside of the car. Tr. 57:2-17. Officer Tantillo testified that although he did not specifically know a gun had been found at that point, he "knew something had been found" based on Lieutenant Cahill's body language. Tr. 18:22-19:12.
Lieutenant Cahill testified that he then asked the Defendant where the key was, and the Defendant told him it was under the driver's seat of the car. Tr. 57:23-58:14. Lieutenant Cahill was eventually able to locate the keys to the car. Tr. 58:15-24. He testified that he drove the car to the precinct and parked it in a secure garage. Tr. 59:13-60:22. Officer Tantillo testified that the Defendant was transported to the precinct in a marked police vehicle. Tr. 18:8-19. Officer Tantillo returned to the precinct in the same unmarked vehicle that he and Lieutenant Cahill were driving before they saw the Defendant's car in front of the fire hydrant. Tr. 18:20-21. Back at the precinct, after learning that a gun had been found inside the car, Officer Tantillo testified that he called the evidence collection team, or ECT, to come to the precinct to process the firearm. Tr. 19:13-20:2. Officer Tantillo also testified that he performed an inventory search, or "voucher," of the vehicle, which involves "itemizing the different things that are inside the vehicle. That way everything is accounted for, vouchered, given a number, and everything is in place." Tr. 22:3-15. Officer Tantillo testified that the NYPD has guidelines in the patrol guide for how to conduct an inventory search. Tr. 22:16-21.
*456 In this case, that inventory search included vouchering the jacket, the gun, and some clothes in the trunk of the car. Tr. 22:25-23:6. Lieutenant Cahill also testified that under normal police procedure, if he had located the keys to the car on the Defendant's person without searching the vehicle, he "would have immediately drove the car back, and have [the Defendant] transported] back to the precinct." Tr. 63:23-64:6. Lieutenant Cahill testified that under normal police procedure, "[b]ack in the precinct an inventory search would be conducted, and the items inside would be voucher[ed] for safekeeping." Tr. 64:7-18.
DISCUSSION & ANALYSIS
I. Legal Standard
The Fourth Amendment to the U.S. Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To enforce the protections guaranteed by the Fourth Amendment, and because the "bare text" of the Fourth Amendment does not itself provide a remedy for illegally-seized evidence, the Supreme Court has created the so-called "exclusionary rule," which "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." Davis v. United States , 564 U.S. 229, 231-32, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) ; United States v. Bershchansky , 788 F.3d 102, 112 (2d Cir. 2015) ("To safeguard Fourth Amendment rights, the Supreme Court created 'an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial.' " (quoting Herring v. United States, 555 U.S. 135, 139, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) ) ).
Warrantless searches are "per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Once it is shown that a warrantless search was conducted, "[t]he burden then shifts to the government to show by a preponderance of the evidence that the police had either reasonable suspicion or probable cause to justify their actions." United States v. Levy, 217 F.Supp.3d 643, 660 (E.D.N.Y. 2016) (Weinstein, J.) (citation omitted). One of the aforementioned "well-delineated exceptions" to the warrant requirement is for automobiles, and is appropriately referred to as the "automobile exception." Under this exception, "police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004) (citing Carroll v. United States, 267 U.S. 132, 151-62, 45 S.Ct. 280, 69 L.Ed. 543 (1925) ). The underlying rationales for the "well-tread" automobile exception are the inherent mobility of automobiles and the reduced expectations of privacy in automobiles, which are subject to a "far-reaching web of state and federal regulations." United States v. Navas , 597 F.3d 492,497-98 (2d Cir. 2010). Furthermore, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) ; see also Navas , 597 F.3d at 497.
It is also well established that a stop based on reasonable suspicion of a traffic violation does not offend the Fourth Amendment. See, e.g., United States v. Stewart , 551 F.3d 187, 191 (2d Cir. 2009) ("We have held repeatedly that a traffic stop based on a reasonable suspicion of a traffic violation comports with the Fourth Amendment."); United States v. Jenkins , 452 F.3d 207, 212 (2d Cir. 2006) ("We find no error in the District Court's determination that the initial basis for the stop of the *457 SUV was valid because the officers reasonably believed that the SUV lacked license plates, which would have been a violation of VTL [Vehicle and Traffic Law] § 402(1)(a)."). Importantly, Fourth Amendment jurisprudence makes clear that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender," even without a warrant. Atwater v. City of Lago Vista , 532 U.S. 318, 323, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). In turn, "probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." United States v. Fisher , 702 F.2d 372, 375 (2d Cir. 1983) (citations omitted).
Under the doctrine of inevitable discovery, evidence obtained as a result of an unconstitutional search need not be suppressed if the Government can "prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police." Nix v. Williams , 467 U.S. 431,447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ; see also United States v. Mendez , 315 F.3d 132, 137-38 (2d Cir. 2002). The Government's burden in establishing inevitable discovery is a preponderance of the evidence, Nix , 467 U.S. at 444, 104 S.Ct. 2501, and in this circuit, the Court must find with "a high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred," United States v. Heath , 455 F.3d 52, 55 (2d Cir. 2006). The Court must "determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." United States v. Eng , 971 F.2d 854, 861 (2d Cir. 1992).
In cases in which the Government claims inevitable discovery on the basis of inventory search procedures, "the court typically concludes that even if the invalid search had not been conducted, the evidence would nonetheless have been discovered in the course of a valid inventory search conducted pursuant to standardized, established procedures." Mendez , 315 F.3d at 138. In these cases, the Government must prove three elements: "(1) that the police had legitimate custody of the vehicle or other property being searched, so that an inventory search would have been justified," "(2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to established or standardized procedures," and "(3) that those inventory procedures would have inevitably led to the discovery of the challenged evidence." Id. (internal quotation marks and citations omitted); see also United States v. Babilonia , 854 F.3d 163, 178 (2d Cir. 2017) ("[A]fter a lawful arrest (for example, after a traffic violation) where a search incident to arrest is not justified, evidence recovered from an immediately ensuing search may be admissible nevertheless if the contents would inevitably have been discovered in a permissible inventory search." (internal quotation marks and citation omitted) ); Heath , 455 F.3d at 55 ("Under the 'inevitable discovery' doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation." (quoting Nix, 467 U.S. at 447, 104 S.Ct. 2501 ) ).
II. Analysis & Application
A. The Stop and Arrest Were Lawful
The Government argues that at approximately 1:50 A.M. on May 31, 2017, *458 Officer Tantillo and Lieutenant Cahill saw the Defendant parked in front a fire hydrant, a violation of New York State Vehicle and Traffic Law § 1202, and also smelled marijuana. See Gov't Post-Hr'g Br. at 3, 6, 8. Section 1202(b)(1) states that "[n]o person shall stop, stand or park a vehicle within fifteen feet of a fire hydrant... unless a different distance is indicated by official signs, markings or parking meters." N.Y. Veh. & Traf. Law § 1202(b)(1). The Government argues that upon seeing the Defendant parked in front of a fire hydrant in violation of § 1202(b)(1), "the officers had reasonable suspicion that the defendant committed a traffic infraction[ ]," and were therefore justified in making a traffic stop of the Defendant. Gov't Post-Hr'g Br. at 8. The Government further argues that when the officers discovered that the Defendant's driver's license was suspended, "they had probable cause to arrest him."[2] Id. at 9.
The Court agrees with the Government and finds that the stop and arrest were lawful. As an initial matter, the law in this circuit is clear that "the reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop," which is precisely what happened here. Stewart , 551 F.3d at 193 ; see also Briukhan v. City of New York, 147 F.Supp.3d 56, 60 (E.D.N.Y. 2015) (Glasser, J.) ("Even a minor traffic violation may constitute a specific and articulable fact sufficient to provide probable cause for the stop." (internal quotation marks and citation omitted) ). Indeed, as the Government points out, the officers had more than reasonable suspicion that the Defendant had committed a traffic infraction-they had probable cause to arrest the Defendant not only for the fire hydrant violation, but also for driving with a suspended license. See Fisher , 702 F.2d at 375 ("[I]n general probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." (citations omitted) ).
As the Supreme Court and Second Circuit have made clear, an arrest is constitutionally proper even for minor traffic offenses. See, e.g., Atwater, 532 U.S. at 323, 121 S.Ct. 1536 (upholding the constitutionality of a warrantless arrest for a seatbelt violation); United States v. Scopo, 19 F.3d 777, 781-82 (2d Cir. 1994). Indeed, in Scopo, the Second Circuit upheld an arrest where officers "directly observed [the defendant] violating the traffic laws by not signaling lane changes." Scopo, 19 F.3d at 782. Here, the officers testified that they not only observed the Defendant parked in front of a fire hydrant, but also confirmed that his driver's license was suspended-both violations of the New York State Vehicle and Traffic Law.[3]
*459 The Defendant argues that the officers' testimony regarding the smell of marijuana coming from the Defendant's vehicle is not credible and is inconsistent with the Complaint (ECF No. 1) in this case, see Def. Post-Hr'g Br. at 6-9, but the Defendant's contentions do not change the conclusion that the stop and subsequent arrest of the Defendant were nonetheless proper because of the traffic offenses observed by the officers, regardless of the smell of marijuana. Indeed, "a police officer who observes a traffic violation may stop a car without regard to ... the officer's own subjective intent.... In other words, an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance." United States v. Dhinsa , 171 F.3d 721, 724-25 (2d Cir. 1998) (citing Whren v. United States, 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ). Notably, the Defendant admits in more than one submission to the Court in support of the present motion that both stopping in front of a fire hydrant and driving with a suspended license "would justify taking him into custody." Def. Mot. to Suppress at 4-5; see also Def. Post-Hr'g Br. at 15-16 ("We concede that Mr. White could have been arrested because his license was suspended."). Thus, both the Defendant and the Government agree that the officers were within their lawful power to detain the Defendant and place him under arrest, and the Court finds no error with this conclusion.
B. Evidence Obtained From the Search of the Vehicle is Admissible
Having established that the Defendant's arrest passes constitutional muster, the Court must now determine whether the evidence obtained from the search of the vehicle is admissible. The Government argues that the automobile exception to the general requirement of a warrant applies because, in short, the Defendant behaved suspiciously and refused to obey the officers' directives. See Gov't Opp. at 13-14. According to the Government, such behavior constitutes probable cause to believe that the car contained evidence of a crime and the search was therefore constitutionally sound pursuant to Carroll v. United States , 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) and its progeny. Id. The Defendant argues that the automobile exception does not apply, relying primarily on the Supreme Court's holding in Arizona v. Gant , 556 U.S. 332, 351, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Def. Post-Hr'g Br. at 4,15-17. The Defendant argues that "like in Gant , the officer's subsequent search of the vehicle does not fall under the automobile exception because it is not reasonable to believe that the vehicle contained evidence of the offense of arrest," and the Defendant had already been removed from the vehicle at the time of the search. Def. Post-Hr'g Br. at 15-16.[4]
*460 The Court finds that probable cause justified the search of the car at the scene of the arrest. As stated earlier, police may conduct a warrantless search of a vehicle "if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." Gaskin , 364 F.3d at 456 (citations omitted). "[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates , 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "A police officer has probable cause to conduct a search when 'the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." Florida v. Harris , 568 U.S. 237, 243, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013) (quoting Texas v. Brown , 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) ). The determination of probable cause is a "flexible, all-things-considered approach" and requires looking at "the totality of the circumstances." Id. at 244, 133 S.Ct. 1050 (citations omitted). As the Second Circuit has explained, "courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." Gaskin , 364 F.3d at 457 (citing United States v. Price , 599 F.2d 494, 501 (2d Cir. 1979) ). Indeed, the Second Circuit has acknowledged that "[p]robable cause can be established by a suspicious sound as it can be by a suspicious smell or appearance." United States v. Jackson , 652 F.2d 244, 251 n.6 (2d Cir. 1981) (citations omitted).
Here, employing a fluid, totality-of-the-circumstances approach, there is ample evidence to establish that the officers had probable cause to search the vehicle. When the officers asked the Defendant to exit the vehicle, the Defendant not only refused the officers' commands but also began moving around inside the car in a highly suspicious manner. Specifically, Officer Tantillo testified that the Defendant "rolled up the window and locked the doors ... [and] said I'm not getting out of the car." Tr. 12:6-8. The Defendant still refused to exit the car even after being told that the Emergency Services Unit would be called if he did not cooperate. Tr. 13:1-4. Officer Tantillo further testified that after refusing to exit the car, the Defendant "was removing a jacket that he had on and he was moving around a lot, reaching underneath the front seat, the back seat, just lunging all around the car." Tr. 13:5-8. The Defendant moved the jacket to the back seat and was "being very antsy, kept reaching back to the back seat." Tr. 33:11-19; 34:8-18. Lieutenant Cahill similarly testified that the Defendant refused to exit the vehicle and rolled up his window, and was also "reaching in the back seat, reaching underneath the seat, and making continuous movements within the car." Tr. 52:11-53:19. In addition, both officers testified that they smelled marijuana. Tr. 7:4-6; 28:22-25; 48:12-14; 67:20-68:2. Considered together, these facts establish probable cause to believe that the car contained contraband or evidence of a crime. See, e.g. , Harris v. United States , 577 Fed.Appx. 70, 71-72 (2d Cir. 2014) (probable cause to search a vehicle in part based on the defendant's suspicious movement and furtive activity in the vehicle prior to being pulled over); United States v. Pughe, 441 Fed.Appx. 776, 778 (2d Cir. 2011) (probable cause to justify a car search based in part on law enforcement's observation of the defendant's furtive movements in the vehicle and the *461 agent's experience); United States v. Martinez-Cortes, 566 F.3d 767, 771 & n.3 (8th Cir. 2009) (probable cause to search a vehicle based on the defendant's refusal to promptly comply with officers' directives during a car stop and attempt to hide something inside the vehicle); United States v. Evans , 08-CR-1207, 2009 WL 2230924, at *6 (C.D. Cal. July 23, 2009) (probable cause to search based partially on defendant's suspicious behavior inside the vehicle after being pulled over).
Even though the Court finds there was probable cause to justify the search of the vehicle, this conclusion is sufficient, but not necessary, to hold the evidence is admissible. This is because even if there was not probable cause to justify the search, the evidence may still be admitted under the doctrine of inevitable discovery, as discussed infra. See Heath , 455 F.3d at 55 ("Under the 'inevitable discovery' doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation." (quoting Nix, 467 U.S. at 447, 104 S.Ct. 2501 ) ).
The Government argues because the Defendant had a suspended license and the officers could not have allowed the Defendant (as an unlicensed operator) to drive the vehicle, "[t]he officers had to take the car into its [sic] custody because its occupant could not legally drive it." Gov't Post-Hr'g Br. at 11. The Government also argues "even if Lt. Cahill had not searched the vehicle at the scene of the arrest, the vehicle would have been impounded and, pursuant to a standard inventory process, the firearm and other contraband inevitably would have been discovered." Gov't Post-Hr'g Br. at 12. The Court agrees with the Government: the firearm and other contraband inevitably would have been discovered. The Second Circuit has held in cases where the Government claims inevitable discovery on the basis of an inventory search, the Government must prove three elements: "(1) that the police had legitimate custody of the vehicle or other property being searched, so that an inventory search would have been justified," "(2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to established or standardized procedures," and "(3) that those inventory procedures would have inevitably led to the discovery of the challenged evidence." Mendez , 315 F.3d at 138 (internal quotation marks and citations omitted). The Court therefore considers whether the Government has met its burden of proof with respect to each element.
The Court finds the officers had legitimate custody of the vehicle, thereby satisfying the first Mendez element. As the officers testified, the car was parked in front of a fire hydrant, had a broken window, and its occupant could not legally drive the car. See Tr. 11:19-12:1; 55:1-6 ("[Lieutenant Cahill:] In this situation, we had to remove the car from the scene."); see also South Dakota v. Opperman , 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."); United States v. Mundy , 806 F.Supp. 373, 376 (E.D.N.Y. 1992) (Weinstein, J.) ("The police are also authorized to seize an automobile not in control of its driver as part of a community caretaking function." (internal quotation marks and citation omitted) ). Additionally, there is no question that both the stop and arrest leading to the police taking custody of the vehicle were proper, as discussed supra. The second Mendez element is also satisfied. Both officers testified there is an established NYPD procedure for conducting inventory searches of impounded vehicles. See Tr.
*462 22:11-21 ("Q: [Ms. Brady] [D]oes the New York City Police Department have guidelines as to how an inventory search is to be conducted? A: [Officer Tantillo] Yes, they do."); 64:3-18; see also NYPD Patrol Guide Procedure 218-13 (outlining procedure for inventory searches of automobiles); United States v. Cancel , 167 F.Supp.3d 584, 594-97 (S.D.N.Y. 2016) (Torres, J.) (finding the existence of a standard NYPD inventory search procedure sufficient to satisfy the second Mendez element based on testimony of the officers involved and NYPD Patrol Guide Procedure 218-13). Finally, the third Mendez element is satisfied. The officers' testimony establishes, pursuant to standard NYPD procedure, an inventory search includes searching for and vouchering every item found inside the car, which the Court agrees would inevitably include the firearm and ammunition. See Tr. 22:11-21 ("Q: [Ms. Brady] What is an inventory search? A: [Officer Tantillo] It would be going through an inventory and itemizing the different things that are inside the vehicle. That way everything is accounted for, vouchered, given a number, and everything is in place."); 64:3-18.
Therefore, the Court concludes "with a high level of confidence," Heath , 455 F.3d at 60, that regardless of the validity of the search of the vehicle at the scene, the Government has shown by a preponderance of the evidence that the firearm and ammunition would inevitably have been discovered during a routine inventory search of the vehicle and are thus admissible. See, e.g, Babilonia , 854 F.3d at 179 (holding that evidence obtained from a car search was admissible because it would have been inevitably discovered during an inventory search); Mendez , 315 F.3d at 138-39 (holding that a handgun and heroin discovered during a car search were admissible because they would have inevitably been found during a valid inventory search); United States v. Bogle, 522 Fed.Appx. 15, 20-21 (2d Cir. 2013) (holding that inevitable discovery applied to evidence discovered following a stop and arrest for violations of the New York State Vehicle and Traffic Law); Cancel , 167 F.Supp.3d at 594-97 (holding that a gun was admissible because it would have inevitably been discovered during an inventory search).[5]
The Defendant argues the Government has not met its burden of proving inevitable discovery by a preponderance of the evidence. See Def. Post-Hr'g Br. 18-21. The Defendant correctly notes, as required by Nix , "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment," Nix , 467 U.S. at 444 n.5, 104 S.Ct. 2501, and this Court must "determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred," Eng , 971 F.2d at 861. The Defendant cites *463 Heath for the proposition that "[a]n officer's isolated statement that an arrest would have occurred ... would not, by itself, be enough to satisfy the government's burden to establish that the arrest was inevitable." Heath , 455 F.3d at 62 n.12 ; see Def. Post-Hr'g Br. at 19. Although the Second Circuit in Heath remanded the issue of inevitable discovery to the district court for further proceedings, Heath involved the question of an officer's "discretionary decision to make an arrest," Heath , 455 F.3d at 61-62 -a different factual scenario than at issue here. Indeed, Lieutenant Cahill's testimony establishes the decision to inventory a vehicle after arresting its occupant is standard police procedure-and therefore not a "discretionary decision" like the arrest at issue in Heath :
[The Court]: Under normal police procedures, what would have happened to the car, with respect to any inspection of the car, with respect to its contents?
[Lieutenant Cahill]: Back in the precinct an inventory search would be conducted, and the items inside would be vouchers [s/c] for safekeeping.
[The Court]: To cut to the chase, under your understanding, once the violations had been established and the man was in handcuffs and you had taken possession of the car, it was going to be searched as a matter of ordinary police procedure; is that right?
[Lieutenant Cahill]: Yes.
Tr. 64:7-18. The Defendant also cites Eng for the proposition that "testimony as to what [the officer] would have done or how [the officer] would have behaved, while deserving of careful consideration as part of the analysis, is not necessarily conclusive on the question of whether a particular piece of evidence inevitably would have been found through lawful means." Eng , 971 F.2d at 862 ; see Def. Post-Hr'g Br. at 19. In Eng , the Second Circuit remanded the issue of inevitable discovery to the district court, finding the district court had not made sufficient factual findings to support its conclusion that inevitable discovery applied. Eng, 971 F.2d at 856. However, Eng involved the complicated issue of whether evidence obtained from an unlawful search would have been inevitably discovered during the course of an investigation through other lawful means, such as the issuance of subpoenas that would have uncovered the information. Id. at 860-64. Again, like Heath, Eng focused on the inevitable discovery doctrine in a different and far more attenuated factual scenario than at issue here. The Court finds "with a high level of confidence," Heath , 455 F.3d at 60, that an inventory search would inevitably lead to the evidence at issue "viewing affairs as they existed at the instant before the unlawful search," Eng , 971 F.2d at 861.
Finally, the Defendant makes two additional arguments in support of his contention that discovery of the evidence was not inevitable. First , the Defendant argues, because his girlfriend was present at the scene, "the officers could have easily decided to leave Mr. White's girlfriend in possession of the car, which means the gun would have never been discovered." Def. Post-Hr'g Br. at 21. Notwithstanding the lack of evidence in the record that doing so would have been consistent with NYPD policy or the officers' usual practice, this argument overlooks at least one other essential fact-that the car had an open, broken window. It appears unlikely the officers would have allowed the Defendant's girlfriend to drive the car away in this state, and in any event, there is nothing in the record to indicate whether the girlfriend had a valid driver's license and was legally able to drive the car. Second , the Defendant argues the officers could have "simply allowed [the Defendant's girlfriend] to gather Mr. White's personal *464 effects before taking the car to the precinct." Def. Post-Hr'g Br. at 21. Again, there is nothing in the record indicating that doing so would be consistent with NYPD policy or the officers' usual practice. Another essential fact cuts against both of the Defendant's additional arguments: the Defendant's suspicious movement inside the vehicle and his refusal to obey police commands prior to being removed from the vehicle. See, e.g., Tr. 12:2-8; 13:1-8; 52:11-21. This highly suspicious behavior strongly undermines the Defendant's arguments that the officers would have let the Defendant's girlfriend drive the car away or allow her to gather his personal effects, particularly given that there was probable cause to believe the car contained contraband or evidence of a crime.
CONCLUSION
The Government has demonstrated that the May 31, 2017 stop and arrest of the Defendant were both proper, and probable cause justified a search of the vehicle pursuant to the automobile exception. Moreover, the Government has also demonstrated that the firearm, ammunition, and other tangible evidence would have inevitably been discovered during an inventory search of the vehicle. The motion to suppress the evidence by the Defendant, Mr. David White, is therefore DENIED.
SO ORDERED.

Mr. Cahill was a Sergeant at the time of the May 31, 2017 incident, but has since been promoted to the rank of Lieutenant. See Tr. 66:25-67:11; Gov't Post-Hr'g Br. at 3 n.3.

Operating a motor vehicle without a proper license is a violation of the New York State Vehicle and Traffic Law. See N.Y. Veh. & Traf. Law §§ 509(1) & 511(1)(a); see also Def. Proposed Findings at 4 ("[D]riving with a suspended license ... [is a] violation[ ] of New York traffic law.").

New York state law authorizes arrest for both of the traffic law violations at issue here, parking in front of a fire hydrant and driving with a suspended license. See N. Y. Crim. Proc. Law § 140.10(1)(a) ("[A] police officer may arrest a person for ... [a]ny offense when he or she has reasonable cause to believe that such person has committed such offense in his or her presence."); N.Y. Veh. & Traf. Law § 155 ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."); see also People v. Chatelain , 65 A.D.3d 930, 886 N.Y.S.2d 679, 679 (1st Dep't 2009) (holding that arrest was proper based on officer's observation that the defendant was driving with a suspended license in violation of New York State Vehicle and Traffic Law §§ 509 and 511 ).

The Defendant acknowledges that the narrower Gant "search incident to arrest" exception operates in addition to, and not in place of, the so-called Carroll exception permitting warrantless searches of automobiles if there is probable cause to believe the vehicle contains evidence of a crime, see Gant , 556 U.S. at 347, 129 S.Ct. 1710, but the Defendant appears to conflate the two exceptions at points. See Def. Post-Hr'g Br. at 15-17; see also Def. Mot. to Suppress at 4-5. The Defendant argues that, in any event, there was not sufficient probable cause of criminal activity to justify a search of the vehicle. See Def. Post-Hr'g Br. at 17.

The Government also argues the search was proper because the officers needed to move the car from the fire hydrant and it had a broken window, among other reasons, and the officers were therefore justified in searching the car for the keys. See Gov't Post-Hr'g Br. at 9-10. The Court agrees. As stated supra , "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." Opperman , 428 U.S. at 369, 96 S.Ct. 3092. As discussed, there is no question that the police were justified in seizing and moving the Defendant's vehicle, and were therefore justified in searching it for the keys with which the car could be operated. Moreover, there is no constitutional issue with performing an inventory search of an impounded car at the scene of the arrest. Mendez , 315 F.3d at 137 n.3 ("Although inventory searches typically occur at a police station or an impoundment facility, rather than at the time of the arrest... the Fourth Amendment does not require that police conduct inventory searches at any particular location." (citations omitted) ).